```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :
THE PRESBYTERIAN CHURCH OF SUDAN, REV.:
MATTHEW MATHIAN DEANG, REV. JAMES KOUNG:
NINREW, NUER COMMUNITY DEVELOPMENT   :
SERVICES IN U.S.A., FATUMA NYAWANG   :   01 Civ. 9882 (DLC)
GARBANG, NYOT TOT RIETH, individually :
and on behalf on the Estate of her   :   OPINION AND ORDER
husband JOSEPH THIET MAKUAC, STEPHEN :
HOTH, STEPHEN KUINA, CHIEF TUNGUAR   :
KUEIGWONG RAT, LUKA AYUOL YOL, THOMAS :
MALUAL KAP, PUOK BOL MUT, CHIEF PATAI :
TUT, CHIEF PETER RING PATAI, CHIEF   :
GATLUAK CHIEK JANG, YIEN NYINAR RIEK,:
and MORIS BOL MAJOK, and on behalf of:
all others similarly situated,       :
                                     :
                    Plaintiffs,      :
                                     :
          -v-                        :
                                     :
TALISMAN ENERGY, INC., and REPUBLIC OF:
THE SUDAN,                           :
                                     :
                    Defendants.      :
                                     :
-------------------------------------X
```

Appearances:

For the Plaintiffs:

Lawrence Kill
John M. O'Connor
Linda Gerstel
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York 10020

Carey R. D'Avino
Stephen A. Whinston
Keino R. Robinson
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

Steven E. Fineman
Rachel Geman
Daniel E. Seltz
Lieff, Cabraser, Heimann &
Bernstein, LLP
780 Third Aveune, 48th Floor
New York, New York  10017

Elizabeth J. Cabraser
Richard M. Heimann
Bill Lann Lee
Lieff, Cabraser, Heimann &
Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, California  94111


For Defendant Talisman Energy, Inc.:

Joseph P. Cyr
Marc J. Gottridge
Scott W. Reynolds
Darcy L. O'Loughlin
Lovells
900 Third Avenue
New York, New York  10022

DENISE COTE, District Judge:

This case involves claims of genocide, crimes against humanity, war crimes, and other violations of international law brought by current and former residents of southern Sudan pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), against the Government of Sudan ("Sudan") and a Canadian energy company, Talisman Energy, Inc. ("Talisman").  An Opinion of March 25, 2005 denied the plaintiffs' motion for class certification (the "Opinion").  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 485 (S.D.N.Y. 2005).  Plaintiffs now move again for class certification pursuant to Rule 23(b)(3), Fed. R. Civ. P., this time with a narrower proposed Class

definition. This motion was fully submitted on August 26, 2005, and oral argument was held on September 16. For the following reasons, the motion is denied.

**BACKGROUND**

Only facts relevant to this motion are summarized here, although more detailed recitations of the allegations and history of this litigation appear in prior Opinions, familiarity with which is assumed.[1] In their first motion for class certification, the plaintiffs sought to certify the following class:

> All non-Muslim, African Sudanese inhabitants of blocks 1, 2 or 4 or Unity State as far south as Leer and areas

---

[1] For additional background, see Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2005 WL 2082847 (S.D.N.Y. Aug. 30, 2005) (denying Talisman's motion to certify the Opinion of June 13, 2005 for interlocutory appeal); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2005 WL 2082846 (S.D.N.Y. Aug. 30, 2005) (denying Talisman's motion for judgment on the pleadings based on the Statement of Interest by the United States Government); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2005 WL 1994098 (S.D.N.Y. Aug. 19, 2005) (denying plaintiffs' motion for discovery sanctions); Presbyterian Church of Sudan v. Talisman Energy, Inc., 374 F. Supp. 2d 331 (S.D.N.Y. 2005) (denying Talisman's first motion for judgment on the pleadings); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2005 WL 1060353 (S.D.N.Y. May 6, 2005) (resolving issues surrounding certain plaintiffs' standing to sue); Presbyterian Church, 226 F.R.D. at 458-65 (comprehensive discussion of facts in context of motion for class certification); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (DLC), 2004 WL 1920978 (S.D.N.Y. Aug. 27, 2004) (denying Talisman's second motion to dismiss); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ("2003 Opinion") (denying Talisman's first motion to dismiss); Presbyterian Church of Sudan v. Talisman Energy, Inc., No. 01 Civ. 9882 (AGS), 2003 WL 1342532 (S.D.N.Y. Mar. 18, 2003) (addressing Sudan's failure to appear).

within ten miles thereof at any time during the period
January 1, 1997 to June 15, 2003, who were injured
during that period by acts of the Sudanese military or
allied militia constituting genocide, extra-judicial
killing, enslavement, forced displacement, attacks on
civilians constituting war crimes, confiscation and
destruction of property, torture or rape.

Presbyterian Church, 226 F.R.D. at 458. The Opinion denied the plaintiffs' motion to certify that class, noting in several passages, including the two recited here, that the plaintiffs would not be able to prove causation in a manner that would comply with the requirements of Rule 23(b)(3):

> Tellingly, the plaintiffs have not described how they
> would confront the burden of showing causation in a
> class action trial. The Class is estimated to include
> between 114,000 and 250,000 members. The Class Period
> encompasses six and a half years of conflict over a
> large territory, and at least hundreds, if not
> thousands, of separate attacks. Although, as indicated
> above, the Complaint alleges numerous specific attacks
> that the named representatives experienced, witnessed,
> or learned of, the Complaint does not contain and the
> plaintiffs have not tendered a comprehensive list of
> the attacks the Class suffered or explained how they
> will develop such a list. It appears, therefore, that
> they envision simply establishing in a general fashion
> that the Campaign existed, and will leave for another
> day proof of specific attacks pursuant to the Campaign
> that injured individual Class members. It is the need
> for evidence of such linkage -- for evidence of
> proximate causation -- that signals the doom for Rule
> 23(b)(3) certification. Given that the only way to
> prove proximate causation is through individualized
> proof, litigation through representatives will not
> suffice. The challenge of presenting that
> individualized proof on behalf of thousands of class
> members, even if it were logistically feasible, will
> quickly dominate the proof regarding the common issues.

Id. at 482-83. The Opinion went on to note:

> The plaintiffs will have to show with respect to each
> individual class member that the injuries for which
> they are claiming damages were actually caused by the
> Campaign. Given that Talisman intends to show that
> warfare persisted through much of the Class Period

4

> between shifting, protean factions of rival rebel
> groups based loosely on tribal affiliations, and that
> such warfare included attacks on villages in the Class
> Area, proximate causation of each attack will be a
> hotly contested issue.

Id. at 482.

The plaintiffs propose two alternative Class definitions that are narrower than that of their prior class certification motion, and that seek to eliminate the issue of proximate causation for a Rule 23(b)(3) common issue predominance inquiry. The definitions limit the class members to victims of aerial attacks, which could only have been carried out by the Government of Sudan, as it was the only party with access to airplanes and helicopters. The first definition the plaintiffs call the "Antonov/Hind Comprehensive Class":[2]

> All non-Muslim, African Sudanese civilian inhabitants
> of blocks 1, 2 or 4 or [sic] Unity State as far south
> as Leer and areas within ten miles thereof (the "Class
> Area") who assert injury or damage from attacks by the
> Government of Sudan that utilized Antonov bombers or
> Hind helicopter gunships during the period January 1,
> 1999, through March 30, 2003 (the "Class Period").

The second definition the plaintiffs call the "Antonov/Hind Villages Class":

> All non-Muslim, African Sudanese civilian inhabitants
> of blocks 1, 2 or 4 or [sic] Unity State as far south
> as Leer and areas within ten miles thereof (the "Class
> Area") who assert injury or damage from attacks by the
> Government of Sudan that utilized Antonov bombers or
> Hind helicopter gunships <u>on the villages listed in
> Attachment A</u> during the period January 1, 1999, through
> March 30, 2003 (the "Class Period").

---

[2] "Antonov" denotes a type of airplane used by the Sudanese military in southern Sudan, while "Hind" denotes a type of attack helicopter used by the Sudanese military in the same region.

5

(Emphasis supplied.)  For the purposes of the Villages Class, the plaintiffs include a list of 142 villages that they allege were subjected to aerial attacks, although they do not list the dates of those attacks nor the witnesses they anticipate would prove each of the attacks.  Indeed, they acknowledge that the list has been developed "from Plaintiffs' discovery responses, the deposition testimony of various witnesses and reports by governmental and non-governmental agencies."  The plaintiffs have also included a list of a small fraction (1,601) of the individuals they contend were killed or injured in attacks, including among other things with each victim's name, the witness who has testified to how the individual was killed or injured.  The witnesses appear to be the named plaintiffs, and it is unclear whether and to what extent the list of victims is based on hearsay.

The plaintiffs include a proposed class action trial plan that would involve two phases.  The first phase would be the trial of the defendants' liability for a common course of conduct in violation of international law, which, according to the plaintiffs, means that they anticipate proving that Talisman and Sudan committed genocide, crimes against humanity, and war crimes, in general as well as against the individual named plaintiffs who fall within the Antonov/Hind Class.  The plaintiffs also anticipate addressing remedies in Phase I, requesting punitive damages, disgorgement of profits, and compensatory damages for the named plaintiffs.  Plaintiffs

propose to ask the Phase I jury to set a ratio of punitive damages to compensatory damages that would be applied to all Class members during Phase II. Phase II of the plaintiffs' proposed class action trial plan would require individual Class Members to prove their membership in the Class, and the amount of damages to which they are entitled. The plaintiffs propose to submit proof organized by individual villages to establish who was present and affected by each attack. The plaintiffs also propose a number of shortcuts to individual damages hearings, such as "communal damages," which would involve assigning damages to villages, not individuals, or statistical sampling as done in Hilao v. Estate of Marcos, 103 F.3d 767, 782-84 (9th Cir. 1996).

**DISCUSSION**

The applicable legal standard for class certification pursuant to Rule 23(b)(3), Fed. R. Civ. P., was discussed in detail in the Opinion and is incorporated by reference here. See Presbyterian Church, 226 F.R.D. at 465-77. In the context of proximate causation, the Opinion noted: "Even in the absence of the rebel warfare, plaintiffs would have to show that each death, rape, decision to flee from one's home, etc., for which they seek damages was proximately caused by the Campaign," id. at 482 n.28, and that "[i]n any event, the dilemma of proving proximate causation would exist in this case even in the absence of the inter-tribal warfare that Talisman trumpets." Id. at 484. The Opinion also noted that

7

> [i]t is true that plaintiffs' causes of action for genocide and crimes against humanity encourage and require, respectively, proof of numerous attacks in order for any one attack to qualify as an act of genocide or a crime against humanity. It is unnecessary to decide today whether a significantly narrowed class definition to include only individuals who were injured in <u>identified attacks that were part of a widespread pattern</u> could be certified, since the plaintiffs have not attempted to limit the class.

Id. at 483 n.29 (emphasis supplied).

Neither of the plaintiffs' proposed Antonov/Hind Classes can be certified. The plaintiffs have not proffered a class that is sufficiently cohesive so that common issues will predominate over those affecting individual class members. The damages to class members occurred over more than four years, a territory of many hundreds of square miles, and at its narrowest, through at least 142 separate incidents. "Rule 23(b)(3) certification is generally granted in a tort case where there is a demonstrated cohesiveness of the class due to a shared experience that is confined in time and place and produces similar effects." Id. at 477.

The flaws in the proposed class definitions are underscored by plaintiffs' trial plan, which does not indicate that the plaintiffs intend to offer first-hand evidence during Phase I regarding attacks in all 142 villages they have identified. Thus, under the plaintiffs' plan, even with the Villages Class, there would be entire villages without first-hand proof of attacks and the effects of the attacks at the conclusion of Phase I. This is even more apparent with the Comprehensive Class, which does not attempt to identify attacks village-by-village.

8

The conclusion of plaintiffs' proposed Phase I would result in a jury's general determination of a campaign of genocide, crimes against humanity, and war crimes ("Campaign"), without linking the vast majority of alleged attacks to the Campaign or proving whether or how each attack injured a village's inhabitants. Were they killed or maimed or did they flee their homes never to return, or did all of these things happen?

Other issues of causation also frustrate a finding that common issues will predominate. The elements of the plaintiffs' claims require proof that each attack was intentional or otherwise part of the Campaign.[3] Eliminating the identity of the actor as a disputed issue by limiting the class definition to victims of aerial attacks still does not establish that the actor intentionally -- as opposed to negligently -- caused an attack in a particular location, that is, it does not affirmatively link every aerial attack in the class area during the class period to the Campaign. Certifying a class pursuant to a trial plan that could result in holding Talisman and Sudan liable for attacks, the existence of which was not proven and for which links to the Campaign were not shown at the initial trial, would "prejudice defendants by lifting the description of the claims to a level of generality that tears them from their substantively required

---

[3] For example, "it is well established that in order to constitute a crime against humanity, the acts of an accused must be <u>part of a widespread or systematic attack directed against any civilian population</u>," <u>Presbyterian Church</u>, 226 F.R.D. at 481 (emphasis supplied), and genocide requires proof of atrocities "committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group." <u>Id.</u> at 478.

9

moorings to actual causation and discrete injury." Id. at 484-85 (citation omitted).

This would be true even in the absence of a civil war in southern Sudan. It is undisputed, however, that a civil war was raging during much of the putative class period, and that Talisman expects to attempt to prove that certain Government aerial attacks were directed at members of rebel armed forces hiding in or near some of the villages in question. Thus, the purpose of each attack will need to be resolved, and the trial will devolve into at least 142 trials addressing the circumstances of each attack.

In sum, to establish the defendants' liability to each class member, factual questions that are individual to each village and each attack will have to be determined. These individual questions of fact preclude a finding that common questions will predominate.

In their renewed motion for class certification, the plaintiffs initially attempted to confront the issues of causation identified in mass tort cases that the Opinion found presented an insuperable barrier to Rule 23(b)(3) certification. In their reply, the plaintiffs abandoned that effort and reverted to an argument that the Opinion had rejected, id. at 483, to wit, that civil rights cases provide the appropriate analogy for certification of plaintiffs' class.

To the extent that the plaintiffs again turn to Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001), this

Court declines to revisit its previous conclusion that Robinson was inapposite because it was decided pursuant to Rule 23(b)(2), Fed. R. Civ. P., and therefore it "did not have to grapple with the issue of predominance inherent in the Rule 23(b)(3) inquiry." Presbyterian Church, 226 F.R.D. at 483. The plaintiffs also cite two district court opinions that certified class actions pursuant to Rule 23(b)(3) involving allegations, respectively, of a police department's racially motivated failure to provide police protection on an Indian reservation, see Pyke v. Cuomo, 209 F.R.D. 33 (N.D.N.Y. 2002), and a police department's policy of strip searching all pre-arraignment prisoners, see Maneely v. City of Newburgh, 208 F.R.D. 69 (S.D.N.Y. 2002). See also McBean v. City of New York, 228 F.R.D. 487 (S.D.N.Y. 2005) (Rule 23(b)(3) certification of a class of pretrial detainees challenging corrections department policy of strip searches of all arraigned misdemeanor detainees). Pyke is inapposite because the alleged racially motivated policy of inadequate police protection constituted a violation of Section 1983 regardless of individual injuries, meaning that "the liability issue is not individualized, but rather is common to the class as a whole." Pyke, 209 F.R.D. at 45 (emphasis in original). The court in Maneely recognized that a determination of the liability of the defendant to each class member required an individualized inquiry of the circumstances surrounding each strip search. Maneely, 208 F.R.D. at 78. Maneely therefore chose to enter only a partial certification order that would decide whether the defendant

11

maintained an illegal policy of strip searching all prisoners. Id. If the class prevailed, individual plaintiffs would be permitted to litigate the liability and damages issues in separate, individual actions. Id. at 79.

Finally, the plaintiffs ask for partial certification.[4] Partial certification does not provide a satisfactory resolution of the complex challenges facing a class action in the circumstances presented here. It would defer until another day

---

[4] In their motion papers, the plaintiffs identify a variety of common fact issues for which they seek partial certification, including: whether the Government of Sudan planned and implemented the Campaign against non-Muslim Africans in the Class Area; whether Talisman knew, recklessly ignored, or should have known of the existence of the Campaign when it acquired Arakis and when its officers and employees acted as directors of GNPOC; whether the Government of Sudan used Antonov bombers and Hind helicopter gunships to carry out the Campaign; whether extracting oil from the Class Area was a motivating factor behind the Campaign; whether Talisman provided infrastructure, supplies, funds, and other assistance to the Government of Sudan to carry out the air attacks that were part of the Campaign; whether the Government of Sudan's oil revenues derived from the Class Area were used to purchase bombers, gunships, or other weapons used in the Campaign; and whether Talisman's conduct justifies the imposition of punitive damages.
　The plaintiffs also identify a variety of common issues of law for which they seek partial certification, including: whether the Campaign, including air attacks, constitutes genocide, crimes against humanity, and war crimes; whether the infrastructure, supplies, funds, and other assistance Talisman supplied to the Government of Sudan establishes Talisman's liability as a principal for genocide, war crimes, or crimes against humanity, or as a co-conspirator or aider and abettor of those offenses; whether Talisman is legally responsible for the acts and omissions of its officers, directors, and employees in Sudan, as well as the acts and omissions of its subsidiaries' and affiliates' officers, directors, and employees in Sudan; whether Talisman may be held liable for the acts of GNPOC relating to the Campaign based on Talisman's participation in GNPOC or theories of agency; whether GNPOC or Talisman had command responsibility as a result of GNPOC's membership in the Special Security Council; and whether disgorgement is an appropriate remedy for the violations alleged by the Antonov/Hind Plaintiffs.

12

decisions on too many of the critical issues on which Talisman's liability to each class member rests. A general determination that a campaign of genocide existed and that Talisman participated in it on occasion and to some degree is insufficiently tethered to Talisman's liability to an individual class member to have value. The Court declines to certify a class to resolve limited issues.

## CONCLUSION

The plaintiffs' renewed motion for class certification is denied.

SO ORDERED:

Dated: New York, New York
September 20, 2005

_____
DENISE COTE
United States District Judge