UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THE PRESBYTERIAN CHURCH OF SUDAN, REV.  :
MATTHEW MATHIAN DEANG, REV. JAMES KOUNG :
NINREW, NUER COMMUNITY DEVELOPMENT      :
SERVICES IN U.S.A., FATUMA NYAWANG      :      01 Civ. 9882 (DLC)
GARBANG, NYOT TOT RIETH, individually   :
and on behalf on the Estate of her      :      OPINION & ORDER
husband JOSEPH THIET MAKUAC, STEPHEN    :      ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
HOTH, STEPHEN KUINA, CHIEF TUNGUAR      :
KUEIGWONG RAT, LUKA AYUOL YOL, THOMAS   :
MALUAL KAP, PUOK BOL MUT, CHIEF PATAI   :
TUT, CHIEF PETER RING PATAI, CHIEF      :
GATLUAK CHIEK JANG, YIEN NYINAR RIEK,   :
and MORIS BOL MAJOK, and on behalf of   :
all others similarly situated,          :
                                        :
                     Plaintiffs,        :
                                        :
          -v-                           :
                                        :
TALISMAN ENERGY, INC., and REPUBLIC OF  :
THE SUDAN,                              :
                                        :
                     Defendants.        :
                                        :
----------------------------------------X


Appearances:

For the Plaintiffs:

Carey D'Avino
Stephen Whinston
Keino Robinson
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania  19103


Lawrence Kill
John O'Connor
Stanley Bowker
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York  10020

Steven E. Fineman
Rachel Geman
Daniel E. Seltz
Lieff, Cabraser, Heimann &
Bernstein, LLP
780 Third Avenue, 48th Floor
New York, New York  10017


For Defendant Talisman Energy, Inc.:

Joseph P. Cyr
Marc J. Gottridge
Scott W. Reynolds
Lovells
590 Madison Avenue
New York, New York  10022

TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . 5

Background . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    The Conflict in the Sudan . . . . . . . . . . . . . 9

    B.    Oil Development in Southern Sudan Before 1996 . . . 11

    C.    Consortium . . . . . . . . . . . . . . . . . . . . 15

    D.    Lundin Oil . . . . . . . . . . . . . . . . . . . . 17

    E.    Talisman's Acquisition of Arakis . . . . . . . . . 17

    F.    TGNBV . . . . . . . . . . . . . . . . . . . . . . 21

    G.    GNPOC Security Arrangements: 1999 to 2003 . . . . . 23

    H.    Logistical Support of the Military . . . . . . . . 24

    I.    "Buffer Zone" Strategy . . . . . . . . . . . . . . 25

    J.    The Airstrips . . . . . . . . . . . . . . . . . . 28

    K.    GNPOC Effort to Extend Operations "South of the River"

        . . . . . . . . . . . . . . . . . . . . . . . . . 37

    L.    Talisman Denies Knowledge of Human Rights Abuses . 39

    M.    The Plaintiffs' Injuries . . . . . . . . . . . . . 40

Discussion . . . . . . . . . . . . . . . . . . . . . . . 50

    I.    Motion for Summary Judgment . . . . . . . . . . . 50

        A.    Conspiracy . . . . . . . . . . . . . . . . . . 51

        B.    Aiding and Abetting . . . . . . . . . . . . . 58

i

1.   The Elements of Aiding and Abetting Liability
     Under International Law . . . . . . . . .  59

2.   Genocide  . . . . . . . . . . . . . .  65

3.   Crimes Against Humanity . . . . . . . . .  68

4.   War Crimes  . . . . . . . . . . . . .  70

5.   Substantial Assistance  . . . . . . . . .  71

     a.   Developing the Unity and Heglig
          Airstrips  . . . . . . . . . . . .  74

     b.   Exploring "South of the River" . . .  78

     c.   Financial Assistance to the Government
          . . . . . . . . . . . . . . . .  79

     d.   Acts of Assistance to the Military .  82

     e.   Remaining Examples of Assistance . .  82

6.   Causation . . . . . . . . . . . . . .  83

II.  Motion to Amend Complaint . . . . . . . . .  88

     A.   Choice of Law Rule . . . . . . . . . . .  93

     B.   GNPOC  . . . . . . . . . . . . . . .  97

          1.   Veil Piercing . . . . . . . . . . .  97

          2.   Joint Venture Liability . . . . . . . .  98

     C.   TGNBV and Goal Olie  . . . . . . . . . .  104

          1.   Piercing the Veil . . . . . . . . . .  104

          2.   Agency Liability  . . . . . . . . . .  106

     D.   English Subsidiaries . . . . . . . . . .  109


Conclusion  . . . . . . . . . . . . . . . . . .  111

DENISE COTE, District Judge:

This case involves the most serious of issues.  The plaintiffs have suffered greatly, and in filing this lawsuit they sought to represent all of the non-Muslim Africans who live in and near oil rich lands in the southern Sudan who were injured during six years of the decades-long armed conflict that has gripped the region.  They have sued two defendants: the Republic of the Sudan ("Government") and a Canadian corporation, Talisman Energy, Inc. ("Talisman"), for violations of international human rights.  Talsiman indirectly held oil interests in the Sudan from October 1998 through March 2003, and its role in oil development in the Sudan and in the regional conflict is at the heart of this lawsuit.

As the litigation has unfolded, it has presented complex issues of international law and the reach of America's Alien Torts Statute ("ATS"), 28 U.S.C. § 1350.[1]  Talisman has resisted being hauled into an American court to answer charges arising out of events in Africa.  The Republic of Sudan has refused to make any appearance in the litigation and is in default.

Now, as the litigation enters its final stages, with summary judgment motions fully briefed and a trial scheduled for January

---

[1] As it has in previous Opinions in this litigation, this Opinion will refer to the statute as the Alien Tort Statute.  See Presbyterian Church of the Sudan v. Talisman Energy, Inc., 226 F.R.D. 456, 469 n.6 (S.D.N.Y. 2005).  Courts have also called the statute the Alien Torts Claim Act, see e.g., Flores v. Southern Peru Copper Corp., 343 F.3d 140, 143 (2d Cir. 2003), as well as the Alien Tort Act, see, e.g., Kadic v. Karadzic, 70 F.3d 232, 236 (2d Cir. 1995).

1

8, 2007, the critical issue is whether the plaintiffs have
gathered sufficient admissible evidence to show that Talisman
engaged in any of the violations of international law on which it
stands accused by the plaintiffs.  More precisely, the plaintiffs
seek to hold Talisman liable for having conspired with or aided
the Government in committing three crimes recognized under
international law: genocide, crimes against humanity, and war
crimes.  The crime against humanity that is at stake is the
widespread and systematic forcible transfer of a civilian
population.  The war crime is the targeted attacks by the
military on civilians.

The plaintiffs have failed to locate admissible evidence
that Talisman has violated international law.  The hurdles the
plaintiffs faced were many since (1) Talisman did not have any
operational presence in the Sudan, and the plaintiffs did not sue
the affiliate of Talisman that did have a presence in the Sudan
and was more directly connected to events there;[2] (2) neither the
Sudanese government nor the consortium that ran the oil
exploration activities in the Sudan cooperated with the
plaintiffs, and the plaintiffs' efforts to obtain evidence were
severely frustrated; and (3) in any event the challenges of
gathering the admissible evidence required to support plaintiffs'
case in a desperately poor, distant country engulfed in civil war
are significant.

---

[2] It is not clear, of course, that there was personal
jurisdiction over that Talisman affiliate in the United States.

2

For these and other reasons, in opposition to the summary judgment motion, the plaintiffs have not distinguished between the admissible and inadmissible.  The plaintiffs repeatedly describe "Talisman" as having done this or that, when the examination of the sources to which they refer reveals that it is some other entity or an employee of some other company that acted.  They assert that this or that event happened, when the documents to which they refer consist of hearsay embedded in more hearsay.  Indeed, most of the admissible evidence is either statements made by or to Talisman executives, and the plaintiffs' descriptions of their own injuries, with very little admissible evidence offered to build the links in the chain of causation between the defendant and those injuries.

In recognition of the very serious gaps in their proof, the plaintiffs moved on the eve of the summary judgment practice to reconfigure the legal landscape with a far reaching proposal for amending their complaint.  The thrust of the amendment would impose liability on Talisman for the activities of the consortium of oil companies that operated on the ground in the Sudan.  This motion to amend, however, is unsupported by the legal or factual analysis that should have accompanied such an untimely and potentially transformative motion.

Talisman has separately moved to preclude plaintiffs from seeking categories of damages not previously identified by the plaintiffs.  The motion was made after Talisman received plaintiffs' expert report on damages, which indicated that

3

plaintiffs were seeking to recover categories of damages they had not identified in their Rule 26(a)(1) statements served more than two years earlier.

As the following discussion explains, Talisman is entitled to summary judgment on the claims which the parties have litigated for five years.  In addition, the plaintiffs are not entitled to amend their pleading.  Talisman's motion to preclude certain categories of damages is denied as moot, as is that part of its motion for summary judgment that addresses plaintiffs' claim for disgorgement of Talisman's revenues from its investment in the Sudan.

The decision to grant summary judgment for Talisman becomes inescapable once the Federal Rules of Evidence and Civil Procedure are applied to the parties' submissions on this motion. It does not reflect a finding that the plaintiffs and their neighbors did not suffer great harms, or that the Republic of Sudan did not engage in gross violations of international law and the norms of civilized behavior.  It does not even pass on the wisdom or propriety of Talisman's conduct.  Instead, this Opinion addresses an issue that applies to every civil lawsuit filed in this country as it nears trial whether the issues being litigated are relatively mundane or of profound human consequence, as is true here.  The issue is whether the plaintiffs have supplied sufficient admissible evidence to proceed to trial on their claims.  They have not.

## Procedural History[3]

Plaintiffs filed their class action complaint on November 8, 2001.[4]  On March 19, 2003, the Honorable Allen G. Schwartz, to whom this case was originally assigned, denied Talisman's motion to dismiss brought on the basis of lack of subject matter jurisdiction, lack of personal jurisdiction, <u>forum non conveniens</u>, international comity, act of state doctrine, political question doctrine, failure to join necessary and indispensable parties and equity considerations.  <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 244 F. Supp. 2d 289 (2003) ("2003 Opinion").[5]  This action was assigned to this Court on April 16, 2003.  On June 13, 2003, a Scheduling Order set the

---

[3] For additional background, <u>see</u> <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (DLC), 2005 WL 2082847 (S.D.N.Y. Aug. 30, 2005) (denying Talisman's motion to certify the Opinion of June 13, 2005 for interlocutory appeal); <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (DLC), 2005 WL 2082846 (S.D.N.Y. Aug. 30, 2005) (denying Talisman's motion for judgment on the pleadings based on the Statement of Interest from the United States Government); <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (DLC), 2005 WL 1994098 (S.D.N.Y. Aug. 19, 2005) (denying plaintiffs' motion for discovery sanctions); <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (DLC), 2005 WL 1060353 (S.D.N.Y. May 6, 2005 (resolving issues surrounding certain plaintiffs' standing to sue); <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (DLC), 2004 WL 1920978 (S.D.N.Y. Aug. 27, 2004) (denying Talisman's second motion to dismiss).

[4] The complaint was amended on February 25, 2002, and August 18, 2003.

[5] On March 18, 2003, Judge Schwartz ruled that the Government of Sudan must make an appearance if it wished to assert its immunity under the Foreign Sovereign Immunity Act (FSIA), 28 U.S.C. § 1602 <u>et seq.</u>  <u>Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 01 Civ. 9882 (AGS), 2003 WL 1342532 (S.D.N.Y. Mar. 18, 2003).

dates for motion practice and established that fact discovery would close on March 25, 2005.  During the discovery period, the parties deposed ninety-five witnesses.

An Opinion of March 25, 2005 denied plaintiffs' motion for certification of a class.  Presbyterian Church of the Sudan v. Talisman Energy, Inc., 226 F.R.D. 456 (S.D.N.Y. 2005). Plaintiffs' second motion for certification, with a narrower class definition, was denied in an Opinion of September 20, 2005. Presbyterian Church of the Sudan v. Talisman Energy, Inc., 01 Civ. 9882 (DLC), 2005 WL 2278076 (S.D.N.Y. Sept. 20, 2005).

Between the plaintiffs' two motions for class certification, Talisman moved for judgment on the pleadings based on the Supreme Court's decision in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), and the Second Circuit's decision in Flores v. Southern Peru Copper Corp., 406 F.3d 65 (2d Cir. 2003).  Talisman claimed that the standards articulated in those two opinions made the 2003 Opinion's decision to recognize corporate and secondary liability under the ATS clearly erroneous.  Talisman's motion was rejected in an Opinion dated June 13, 2005.  Presbyterian Church of the Sudan v. Talisman Energy, Inc., 374 F. Supp. 2d 331, 332 (S.D.N.Y. 2005).

In the Fall of 2005 a trial date was set for January 8, 2007.  Talisman moved for summary judgment on April 28, 2006.  On the same day that Talisman moved for summary judgment, each side moved to preclude testimony from opposing expert witnesses. Talisman moved against seven expert witnesses offered by the

plaintiffs: Gaspar Biro, Douglas Johnson ("Johnson"), Salem
Mezhoud, Ronald Vollmar, James Levinsohn, Sherwood Goldberg
("Goldberg"), and Sharon Hutchinson.  The plaintiffs moved
against four of Talisman's experts: Peter Bechtold, Andrew
Buchanan, Aidan Davy and Emery Brusset.

Plaintiffs' opposition to Talisman's summary judgment motion
was filed on May 26, 2006.  Their papers included a memorandum of
law, a thirty page response to Talisman's Rule 56.1 statement of
material undisputed facts ("Responsive Statement"), a seventy-two
page additional statement of material disputed facts ("Additional
Statement"), and two sets of exhibits.  One set contained
seventy-one exhibits[6] in two volumes.  The second set contained
one hundred and seventeen exhibits in ten volumes.[7]

Despite the volume of plaintiffs' evidence, their arguments
rest on a dozen or so pieces of evidence to which they refer
repeatedly.  Those pieces of evidence include excerpts from three
depositions: James Buckee ("Buckee"), Talisman's CEO; Ralph
Capeling ("Capeling") the general manager of Talisman (Greater
Nile) B.V. or TGNBV, Talisman's indirect subsidiary which held
Talisman's interests in the Sudan; and Mark Reading ("Reading"),

---

[6] A subsequent submission added three more exhibits.

[7] The Additional Statement referred to documents not by an
exhibit number but by Bates number.  At the request of the Court,
the plaintiffs revised their submission and provided citations to
exhibit numbers.  In their revised submission the plaintiffs
often cite to collections of exhibits without identifying a
document or passage.  The end result has been to make it
particularly challenging to assess whether plaintiffs have
admissible evidence to support their arguments.

a security advisor employed by TGNBV.  Plaintiffs rely as well on
a handful of TGNBV documents and several documents which appear
to have been generated by Talisman itself.  Many of these
documents appear to contain hearsay, including reports about
events witnessed by others.  Some of the plaintiffs' most
striking accusations against Talisman are drawn from affidavits
prepared by Ian Taylor ("Taylor") for litigation against Talisman
in Canada.  Taylor was never deposed, is now deceased, and his
affidavits are inadmissible.

On April 12, 2006, just two weeks before the summary
judgment motion was filed, the plaintiffs filed a motion to amend
their complaint.  The complaint on which the parties conducted
discovery was the Second Amended Complaint, filed on August 18,
2003 ("2003 Complaint").  The proposed Third Amended Complaint
shall be referred to as the 2006 Complaint.  The motion to amend
is addressed after the discussion of the summary judgment motion.

## Background

The following facts are undisputed, or taken in the light
most favorable to the plaintiffs, unless otherwise noted.  In
order to describe as fairly as possible the evidence the
plaintiffs present, the description of events that follows is
largely taken from the documents on which the plaintiffs have
placed the greatest reliance, without a careful analysis of the
admissibility of this evidence.  It should be borne in mind that
the plaintiffs have not yet shown that a percipient witness is

available to testify to many of the events that are described
below.

A.   The Conflict in the Sudan

        The recent history of the Sudan has been described several
times in this litigation.  See Presbyterian Church, 226 F.R.D. at
461-63; Presbyterian Church, 244 F. Supp. 2d at 296-99.  Because
that history provides context to the issues presented in
Talisman's motion for summary judgment, it is summarized here.

        Sudan is the largest country in Africa and has a population
of approximately 41 million.  The population in the North is
predominately Arab and Muslim, while the population in the South
is largely non-Muslim and African.  The two largest ethnic groups
in southern Sudan are the Dinka and Nuer.  A map showing the
boundaries of the Sudan follows:



Since gaining its independence in 1956, the Sudan has suffered through two long periods of civil war fueled by the struggle between the Government, which is Arab-dominated and based in the North, and rebels based in the South. The second, more recent civil war began in 1983, and was initially a struggle against the Government waged by the Sudan People's Liberation

10

Army ("SPLA") led by John Garang ("Garang").  In 1991, the SPLA split into competing factions.  From 1991 to 1997, those factions fought each other, as well as the Government.

In April 1997, the Government, and major rebel groups with the exception of the SPLA, signed the Khartoum Peace Agreement ("Khartoum Agreement").  As part of the agreement the rebel groups became the Southern Sudanese Defense Force ("SSDF") and entered into a partnership with the Government.  Beginning in 1998, the SSDF split apart as senior military commanders left and formed their own militia groups.  Some of the militia groups that were formed out of the SSDF were funded by the Government.  By the end of 2000, the Khartoum Agreement had collapsed and fighting broke out again in the South among militia groups, as well as between militia groups and the Government.  It is undisputed that during the time that Talisman was involved with the Sudan, southern Sudan was the site of increasing levels of violent conflict among a number of armed groups.

B.   Oil Development in Southern Sudan Before 1996

After oil was discovered by Chevron in southern Sudan in 1979, the Government granted concessions to explore and extract oil in this region by dividing territory into numbered "blocks." The Sudan is made up of twenty-six states, and the oil concessions relevant to this litigation are spread among five of them: Unity (also referred to as Western Upper Nile), Western

11

Kordofan, Northern Bahr el Ghazal, Jonglei, and Warab.[8]

Block 1, or the Unity oilfield, is north of the town of Bentiu and is now the southern terminus of the Sudan oil pipeline ("Pipeline"), which runs to the Red Sea in northeast Sudan. Block 1 is the only one of the three blocks that is located entirely within Unity State. Block 2, or the Heglig oilfield, is northwest of and adjacent to Block 1. Block 2 is mostly located in Western Kordofan State. Block 4, or the Kaikang oilfield, is a large block to the south and west of Blocks 1 and 2 and is primarily located in Western Kordofan, Northern Bahr el Ghazal and Unity States. The Government also designated Block 5A, which figures prominently in this litigation. Block 5A abuts a portion of the eastern borders of Blocks 1 and 4, and is primarily located in Unity State, but also touches Jonglei, and Warab.

The maps that follow show the geography of the relevant states and the boundaries of the oil concession:

---

[8] The spelling of the names of these states, which differs from the spelling on the map that follows, is drawn from the CIA World Factbook. See The World Factbook, Sudan (last updated Aug. 22, 2006), https://www.cia.gov/cia/publications/factbook/geos/su.html.





On August 29, 1993, State Petroleum Company ("SPC"), a Canadian company, purchased the rights to Blocks 1, 2, and 4 and

14

entered into a production sharing agreement with the Government
to develop these blocks exclusively.  From 1993 to 1996, SPC was
the only oil company operating in Blocks 1, 2 and 4.  The total
area of these blocks consisted of 130,000 acres of "developed"
land with proven oil reserves, and nearly 12 million acres of
"undeveloped" land with no proven oil reserves.

In May 1994, Arakis Energy Corporation ("Arakis"), a
Canadian corporation, acquired SPC, which became a wholly owned
subsidiary of Arakis.  In 1996, the Government attempted to
terminate SPC's concession rights, alleging that SPC had failed
to perform drilling and production activities under the
production sharing agreement.  In reaction, SPC began to look for
partners to build a consortium that could increase production
levels.  It found several.


C.   Consortium

On November 29, 1996, China National Petroleum Corporation
("CNPC"), Petronas Carigali Overseas SDN BHD ("Petronas"), and
Sudapet Ltd. ("Sudapet") joined with SPC (collectively
"Consortium Members") to establish a consortium to conduct oil
exploration in the Sudan and to construct, own and operate the
Pipeline.  All of the Consortium Members except for SPC are
wholly owned by governments: China, Malaysia, and the Republic of
Sudan, respectively.  An interim agreement between the Consortium
Members became effective on November 29, 1996 ("Interim
Agreement").  On February 28, 1997, they entered into the

Consortium Agreement ("Consortium Agreement"), which updated the
Interim Agreement.

In addition to these two documents, the consortium's
activities are governed by two other sets of agreements.  One set
covers the relationship between the Consortium Members and the
Government and relates to the three separate but related projects
undertaken by the Consortium Members.  The oil operations
conducted in Blocks 1, 2 and 4 are governed by the Exploration
and Production Sharing Agreement ("EPSA"); the construction and
operation of the Pipeline is governed by the Crude Oil Pipeline
Agreement ("COPA"); and the rights to use the land on which the
Pipeline is constructed is governed by the Surface Lease
Agreement ("Surface Agreement").

A second set of agreements governs the relationship among
the Consortium Members and their conduct of the projects
undertaken by the consortium.  The Joint Operating Agreement
("JOA") covers oil exploration, production, and development in
Blocks 1, 2 and 4.  The Joint Construction and Operating
Agreement ("JCOA") covers the construction and operation of the
Pipeline.

The Consortium Members established the Greater Nile
Petroleum Operating Company Limited ("GNPOC") as the entity which
would conduct operations for the Consortium Members under their
agreements with the Government.[9]  Both the JOA and the JCOA

---

[9] GNPOC was a party to the JCOA and was added as a party to
the JOA by a supplemental deed dated July 23, 1999.  The intent
to create GNPOC is expressly described in the Consortium

identify GNPOC as an independent contractor.  The JOA, JCOA, EPSA and COPA will be referred to collectively as the "GNPOC Project Agreements."  The shares of GNPOC were 40% owned by CNPC, 30% owned by Petronas, 25% owned by SPC and 5% owned by Sudapet. Thus, the Canadian company owned one-quarter of GNPOC.


D.   Lundin Oil

    In 1998, Lundin Oil AB ("Lundin Oil"), a Swedish company, obtained the rights to explore for and produce oil in Block 5A. Lundin Oil conveyed its interests in Block 5A to Lundin Petroleum AB ("Lundin Petroleum"), an affiliated Swedish company, in 2001. Lundin Petroleum sold its interests in Block 5A in April 2003. Lundin Oil and Lundin Petroleum shall be referred to collectively as Lundin.  During its period as the operator, Lundin constructed and maintained roads within Block 5A.  Lundin's interests in the Sudan were held through several subsidiaries including International Petroleum Corporation ("IPC") and many documents on which the plaintiffs rely refer to interactions between GNPOC and IPC.


E.   Talisman's Acquisition of Arakis

    Talisman, headquartered in Calgary, Alberta, is an oil and gas exploration and production company with global operations. Talisman's international assets are generally held by

---

Agreement.  GNPOC is not a party to the agreements with the Government.

subsidiaries.  In October 1998, during a period of hope created by the Khartoum Agreement, Talisman acquired Arakis.  Prior to acquiring Arakis, senior Talisman officials traveled to the Sudan to conduct due diligence.  While in the Sudan the Talisman officials met with Government officials including Rick Machar ("Machar"), then the First Assistant to the President of the Sudan and the head of the Southern Sudan Coordinating Council ("SSCC").  The SSCC was a political body established by the Khartoum Agreement to serve a coordinating and supervisory role in the southern Sudan and to serve as link between the South and the Government.[10]

The Talisman officials visited several GNPOC sites, and spoke with representatives of the British government in the Sudan about the political and security situation.  From 1898 through 1956, Sudan had been a British-Egyptian condominium.  Talisman commissioned two independent reports concerning the security and political situation in the Sudan.

Through these efforts, Talisman learned that GNPOC had an agreement with the Sudanese Army that it would provide security for the GNPOC oil operations and that GNPOC security advisors had daily contact with the Sudanese Army.  Robert Norton ("Norton"),

---

[10] Under the Khartoum Agreement, the SSCC was to be composed of ministers appointed by the President of the SSCC in consultation with "Southern political forces"  The Governors of the southern states also sat on the SSCC.  The President of the SSCC was to be appointed by the President of the Sudan "in consultation with the parties signatory" to the Khartoum Agreement.

who had served as the head of security for Arakis in the Sudan from 1994 to 1998, told Talisman's Buckee and Talisman Vice President Mary Sheppard ("Sheppard") in September 1998 during a "roundtable" meeting held in Canada concerning Canada's relationship with Sudan, that the Government used not just its military but also Government-sponsored militia to protect GNPOC oil fields.  Norton also expressed his opinion that Talisman's presence in the Sudan would make oil exploration in the Sudan successful, and that that would increase Government oil revenues and tip the military balance in the Sudan in favor of the Government.[11]

One of the attendees at the roundtable was Melville Middleton ("Middleton"), a Canadian associated with Freedom Quest International.  Middleton asked whether Talisman had contacted groups with knowledge of human rights violations by the Government, and was told by Sheppard that the Government had informed Talisman that "the deal was off" if Talisman talked to the "other side."  Middleton advised Sheppard, Buckee, and other Talisman officials at the roundtable that GNPOC and the

---

[11] In a declaration in opposition to this motion Norton asserts that he explained to Talisman Vice President Nigel Hares ("Hares") that before any oil development work was done in a new area, the Sudanese military "cleared" the proposed work area of inhabitants to create a "safety zone."  At his deposition, Norton had stated that he did not "specifically recall" the conversation with Hares and denied having personal knowledge of the Sudanese military committing human rights violations against civilians.  A witness may not use a later affidavit to contradict deposition testimony in an effort to defeat a motion for summary judgment.  See Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999).

19

Government were using the Sudanese military to evict civilian inhabitants forcibly and create a "cordon sanitaire" around existing oil fields.  Middleton opined in that conversation that the Government would use oil revenues to buy weapons and fund militias to further the Government's "genocidal policies."

One of the two independent studies commissioned by Talisman was by a security consultant, Control Risks Group.[12]  An April 1998 report prepared by Control Risks Group ("Moss Report") described three roles for the Sudanese military in protecting GNPOC operations as: "[a]rea domination", "[m]ilitary protection teams for key assets," and "[a]rmed escorts for road travel during hours of darkness."  The Moss Report concluded that the presence of army units "creates a substantial deterrent to rebels, bandits or criminals."

At his deposition, Buckee explained that Talisman acquired Arakis because the opportunity to explore for and produce oil in the Sudan was a "technically" good project with attractive terms, and because Talisman thought it could do some good in a very poor country, including potentially serving as a catalyst for peace. In the period leading up to the acquisition, Arakis was having difficulty meeting its financial obligations to GNPOC.  Talisman provided over $46 million in cash to Arakis through a credit arrangement so that it could meet those obligations.

---

[12] The Control Risks Group study was commissioned by Arakis at Talisman's behest in an effort to keep Talisman's interest in the Sudan confidential.

20

After acquiring Arakis, Talisman formed a Sudan Steering Committee ("Steering Committee") comprised of senior-level Talisman officials that met on a weekly basis to address non-operational matters relating to Talisman's investment in the Sudan, including public relations, community development and security.  The Steering Committee included Buckee; Vice-Presidents Talisman Vice President Nigel Hares ("Hares") and Sheppard; and Reg Manhas, who served as Talisman's head of Corporate Social Responsibility.

F.    TGNBV

After it acquired Arakis, Talisman transferred the interests that Arakis had held in GNPOC and in the GNPOC Project Agreements to State Petroleum Corporation B.V., an indirect subsidiary of Talisman, which was renamed Talisman (Greater Nile) B.V. or TGNBV on December 10, 1998.  TGNBV was a wholly-owned subsidiary of Goal Olie-en-Gasexploratie B.V. ("Goal Olie").  In the period that it owned TGNBV, Goal Olie was wholly owned by two English companies, first Supertest Petroleum (U.K.) Limited ("Supertest") and then Igniteserve Limited ("Igniteserve").[13]  Both Supertest and Igniteserve were wholly owned by Talisman Energy (UK) Limited ("Talisman UK").  Talisman UK was a direct and wholly-owned subsidiary of Talisman.  On March 12, 2003, Talisman and Goal Olie sold TGNBV to ONGC Videsh Ltd., an Indian oil and gas

_____

[13] Supertest sold its shares in Goal Olie to Igniteserve on December 23, 1999.

company.  With that sale, Talisman's investment in oil development in the Sudan ended.

The relationship between Talisman and TGNBV was structured through an agreement called a TASA.  Under the TASA, Talisman provided advice to TGNBV on oil operations in the Sudan, including advice on topics such as security, development, and managing the relationship with the Government.  For its part, TGNBV sent TASA requests to Talisman, principally on business and operational issues.  These requests were usually made by Capeling, TGNBV's General Manager.

Talisman also provided TGNBV with employees, including Capeling, through a practice called secondment.  Secondment refers to the assignment of an individual from one of Talisman's companies to another for a defined period of time, usually in the range of two to three years.[14]  Capeling reviewed the compensation of seconded employees, their job performance, and the continued need for their positions.  The seconded TGNBV employees also reported to GNPOC line managers.

TGNBV did not actually conduct any oil operations in the Sudan; oil exploration and production work was performed by GNPOC.  Of particular importance to the issues in this

---

[14] What appear to be the minutes of a TGNBV Board of Directors meeting describe employees seconded to TGNBV from Talisman as individuals who would "technically continue to be employed or retained as consultants by Talisman" but would be "seconded on a part-time or full-time basis to [TGNBV] and, in carrying out their duties as secondees, would be under the authority and subject to the decisions of the board of directors of [TGNBV]."

litigation, however, TGNBV's staff included two security advisors, Mark Dingley ("Dingley") and Mark Reading ("Reading"). Reading is a retired British soldier.  These two men traveled widely through the GNPOC concession and neighboring areas and were the principal liaison with Mohammed Mohktar ("Mohktar"), the head of GNPOC security.  They prepared periodic reports assessing the danger presented to TGNBV employees working in the GNPOC concession and the threat to the GNPOC oil operations.  The reports were sent to "key personnel" in TGNBV and sometimes also went to senior Talisman officials, "depending on the nature of the report."  The plaintiffs rely heavily on three documents authored by Dingley and Reading, and on their deposition of Reading.

G.   GNPOC Security Arrangements: 1999 to 2003

During the period 1999 to 2003, the Government was heavily engaged in providing security for the GNPOC concession.  The Government commitment included about 1,000 military and police officers assigned to protect the oilfield operations themselves; about 1,300 intelligence officers who worked to gather intelligence in the communities within the concession; and about 5,000 military personnel who were stationed in the concession. These Sudanese security forces were under the control of Sudan's Security Council, which was headed by Sudan's Minister of Mines and Energy.

GNPOC had its own security force, which was unarmed and

which served as a liaison with the Government forces.  From 2000 through 2003, Mohktar was the head of GNPOC security.

H.   Logistical Support of the Military

In October 2000, Talisman and TGNBV worked on drafting guidelines for GNPOC's interaction with and support of the military forces in the concession area.  The guidelines listed acceptable and unacceptable services and supplies, drawing a distinction between support for the Government's defense of GNPOC oil exploration activities and any offensive military action. For example, the proposal allowed GNPOC to share its communications facilities (radios, fax), to provide accommodations at GNPOC rig and facility sites and at checkpoints in the concession area, to repair non-combat vehicles, and to give emergency medical treatment.  Two types of services categorized as "unacceptable" were allowing the military to fill fuel barrels to be taken to strategic locations and to use GNPOC vehicles since GNPOC would have "no control" over how the fuel or vehicles were ultimately used.

Although not everyone within GNPOC believed that it increased the security of GNPOC employees, it was not uncommon for soldiers to ride in GNPOC trucks that delivered employees to well sites.  At one point, GNPOC protested the practice and the military agreed that soldiers would patrol the oil field every night instead.  A GNPOC contractor once witnessed soldiers "going to the battle" being transported in GNPOC trucks.  Sudanese

military officers were also allowed to fly on GNPOC flights.

In May 1999, GNPOC, the Government and IPC built two all-weather roads: one linking the Unity camp to Rubkona and one linking El Toor, an oilfield in Block 1, to Fariang.  Both Rubkona and Fariang had army bases and the roads were considered important to the security of the oilfield.  GNPOC also constructed a ring road around the Unity camp.

I.   "Buffer Zone" Strategy

As part of the strategy for protecting the oil field operations, Sudanese forces cleared key areas of villagers. According to Tabai Deng Gai ("Gai"), a former governor of Unity State, between the signing of the Khartoum Peace Agreement in 1997 and May 1999, the Sudanese military opened garrisons in the GNPOC concession area for defense of the oil operations.  When a garrison was established, local police forces were expelled and villages were destroyed.  Gai testified that he was aware of but had not seen an agreement between the Government and "Talisman" to protect oil operations and pipeline construction, and that pursuant to the agreement, the Government forced people to leave villages by attacking the villages with any means necessary, including small arms fire, artillery, helicopter gunships and bombers.[15]  Gai explained that "it is an affair between the

---

[15] While there is a document from 2000 containing a recommendation that GNPOC enter into a formal security agreement with the Government, the plaintiffs have not pointed to other documentary evidence that a formal agreement was ever executed. It is not clear who the author of the 2000 document is and to

Sudanese army, the Arafiah (?) militia, the Talisman and their
agreement entails that bridges have to be destroyed, people have
to be displaced, people have to be killed if they do not want to
go." (Question mark included in transcript.)  Kwong Danhier
Gatluak ("Gatluak") was chief of military intelligence for the
SSDF from 1991 to 1999 and chief of military intelligence for the
Sudan People's Defense Force ("SPDF") from 1999 to 2002.[16]
Danhier testified that between 1997 and 2003, the Government
forces routinely attacked undefended civilian villages in the
GNPOC oil concession to clear the area for oil exploration.[17]

While it is unclear how much of Gai's and Danhier's
testimony is based on personal knowledge, a report written by
Dingley in 1999 confirms the existence of a "buffer zone"
strategy, at least on a small scale.  It reads:

> The military strategy, driven it appears by the GNPOC
> security management, is to create a buffer zone, i.e.
> an area surrounding both Heglig and Unity camps inside
> which no local settlements or commerce is allowed.
> This has been achieved with the exception of all but a
> few nomadic family tents, and extends to approximately
> 8kms around Heglig and 5kms around Unity.  The
> advantage of this buffer zone is that it allows for

---

whom the document was distributed.

[16] The SPDF, which is also referred to as the Southern
People's Democratic Front, was a militia established by Machar
with former members of the SSDF following the collapse of the
Khartoum Agreement.

[17] The 2003 Complaint refers to a May 1999 Communique which
the plaintiffs do not appear to have submitted with their summary
judgment papers.  As Talisman correctly observes, at this stage
as well as at trial, the plaintiffs may rely only on
authenticated, admissible evidence.  The plaintiffs appear to
concede that they are unable to authenticate the Communique and
it will not be addressed further.

easier control of movement in the vicinity.
(Emphasis supplied.)

A report released in January 2000 by John Harker ("Harker Report") on behalf of the Canadian government provides further evidence of displacement.[18]  The Harker Report relates that between April and June 1999, the population of Ruweng County had declined by 50%, which it attributed primarily to oil development.  Ruweng County is located in Block 1.[19]  The report noted, however, that the displacement was "more or less complete by the time Talisman arrived on the scene" but that it had continued during the time of Talisman's involvement.  Separately, at a meeting in Khartoum, Machar, then head of the SSCC, informed Buckee that "400,000 people had been displaced" in the Sudan.[20]

A June 2002 TGNBV security report describes the "buffer zone" around Heglig camp:

> The focus will return to the ring road at Heglig.  The remaining nomads (from the north) are being "encouraged" to complete their move through the area as soon as possible.  The area within the security ring road while not a sterile area as found on security operations elsewhere (eg [sic] Algeria) is moving in that direction.  Heglig Market has completed its first season out of the area (it was moved this year to the

---

[18] The Harker Report provided an assessment of reports of slavery in the Sudan and the link between oil development and human rights violations, particularly forced displacement. Talisman contends the Harker Report is inadmissible hearsay.

[19] The Report adopted the conclusion of a United Nations official that "a 'swath of scorched earth/clear territory' is being created around the oilfields."

[20] It is not clear from the deposition excerpt provided by the plaintiffs when this meeting took place.

outside of the ring road).  This step up in security
with-in the ring road I believe is a good thing, it is
partly in response to cattle raiding activities as
witnessed last week when shots were fired close to
Heglig in the early hours.


J.   The Airstrips

There were three airstrips within the GNPOC concession area,

two of which were controlled and maintained by GNPOC.[21]  GNPOC's

two airstrips are referred to as the Unity airstrip and the

Heglig airstrip.[22]  GNPOC used the airstrips to support its

activities within the concession.  The two GNPOC airstrips were

also used by the Sudanese military to provision their troops, and

on occasion for defensive military activities.  For at least some

period of time, each of these airstrips was also a base for

attacks against rebel forces and, the plaintiffs contend, against

civilians including nine of the plaintiffs.  GNPOC and military

aircraft operating at the airstrips shared the same fuel tanks,

and GNPOC occasionally allowed military aircraft to use GNPOC

_____

[21] Rubkona airstrip is also located in Block 1 but is close
to the border with Lundin's Block 5A, and supported Lundin's
operations in Block 5A.

[22] It is not entirely clear who owned the Unity and Heglig
airstrips.  Under the terms of the EPSA, land acquired by GNPOC
was to "become the Property of the Government as soon as it is
purchased or acquired."  Title to other fixed and movable assets
was transferred to the Government once the costs of those assets
had been recovered by GNPOC from revenue generated from oil
production.  There are statements in TGNBV documents, however, to
the effect that the Heglig airstrip was a private airfield for
support of GNPOC operations.

28

fuel.[23]

The Heglig airstrip was used extensively by the military. As of 2000, a dozen military flights came into the Heglig airstrip each week to supply Government security forces.

Of greatest concern for this litigation, the Heglig airstrip was also used by Government forces as a staging area for combat operations.  A November 1999 TGNBV security report describes baggage trolleys being used to move ordinance around the airfield and Antonov cargo planes that had been converted for use as bombers being loaded with bombs weighing perhaps as much as 500 pounds.  According to a TGNBV security officer, the use of the Heglig airstrip made sense for the Antonovs because it was "much closer to the area that they were bombing" than any other airstrip.

The Harker Report describes the use of the Heglig airstrip by military aircraft: "flights clearly linked to the oil war have been a regular feature of life at Heglig airstrip."  The report contends that the facility had been used by "helicopter gunships & Antonov bombers of the [Government].  These have armed and re-fuelled [sic] at Heglig and from there attacked civilians."[24]

_____

[23] GNPOC and the military kept fuel in the same fuel tanks but also were aware of how much fuel each had brought into the camp and how much fuel had been used, in essence maintaining a separate fuel balance sheet.  Garth Butcher, a Talisman employee seconded to GNPOC who worked at Heglig, testified that in instances when the military had exhausted its supply of fuel, GNPOC would supply military aircraft with fuel until the military could deliver more.

[24] Talisman contests the admissibility of the Harker Report, in particular its statements about air attacks against civilians.

Talisman, and in particular its CEO Buckee, initially opposed the Government's use of the airstrips for its helicopter gunships or combat operations.  It felt that such operations would draw rebel attacks on the airfields and thus posed a significant threat to the safety of TGNBV and GNPOC personnel. Talisman's objections were occasionally successful: a TGNBV report in January 2000 described a string of objections made in November and December 1999 and stated that "[m]ilitary use of the Heglig airstrip has not been observed since December 1999."  By June 2000, however, combat operations had resumed.  TGNBV security reports describe helicopters and Antanov bombers in June 2000, and Antanov bombers flying runs "around the clock" in October 2000.

The written proposals for moving the Government combat operations away from the Heglig airstrip included a January 2000 TGNBV suggestion that the military be asked to move to the Unity airstrip and a May 2000 suggestion that Talisman secretly pay for a helicopter gunship base and airfield within the GNPOC oil concession area.  There is no evidence that such a base was ever constructed or that this idea was ever pursued further.  Indeed, Buckee testified that the idea was "immediately rejected as being a very silly idea."

The Unity airstrip began as just a dirt stip that was not used with any frequency until it was upgraded in approximately 2000.  By 2001, the Sudanese military was using the Unity

30

airstrip as well as an airfield for its helicopter gunships.

A TGNBV security report from a meeting with GNPOC's Mohktar in May 2001, indicates that Mohktar was not willing to ask the military to move from Unity to Rubkona at that time despite a personal request by Buckee just two weeks earlier that the military cease using the Unity airstrip.[25]  Mohktar felt that the military helicopters were a "key" component in the Government's strategy for dealing with "Gadet"[26] and that its operations "could not continue without them."  Rubkona was not an attractive alternative in Mohktar's view since it was less secure, with too many rebel sympathizers in the vicinity.  An email from Reading to the Talisman Sudan Steering Committee described Unity as "an excellent location" from the Government's point of view because it allowed them to support operations in a variety of important areas without requiring the helicopters to carry extra fuel.

The same TGNBV document from January 2000 describes a series of conversations with Mohammed Khalifa Hussein, a GNPOC employee, about the use of Heglig for bombing attacks.  The report indicates that Khalifa received a promise that the practice would stop, but that it soon resumed.  This account is consistent with a TGNBV security report that suggests transferring the Unity airstrip to the Sudanese military, in part because of TGNBV's

---

[25] The author of the report is not identified.

[26] "Gadet" refers to Peter Gadet, a military commander who had initially served in a militia that had splintered from the SSDF, but then had broken from that splinter group, and was believed to be affiliated with the SPLA.

inability to control its use:

> My personal view is that some thought should be given
> to turning over Unity Airstrip to the military in an
> official capacity, I struggle to see any alternative
> other than the present line of "defensive only"
> operations.[27]  I think it is time to accept that they
> will not move to Rubkona in the forseeable future
> (still a longer-term aim) and that the military will
> not build their own facilities.  <u>They (government) have
> strung this along this far and I think they will
> continue to do that despite on occasions telling us
> what we want to hear</u>.  This I feel is the reality of
> the situation.

(Emphasis supplied.)

TGNBV security reports reflect ambivalence about the
presence of the helicopter gunships at the GNPOC airstrips,
noting that they did provide defense for the GNPOC operations,
but that the consortium could not monitor or control what they
did once they were in the air.  It is worth quoting a May 2001
TGNBV security report in some detail:

> [T]hese are the weapons of choice for this type of
> warfare.  They are ideal for the area and terrain in
> which they have to operate.  From a purely pragmatic
> point of view they offer great depth and defence of the
> oil operation in Block 4 and in the future south of the
> river.  <u>They provide legitimate defence of the oil
> assets</u> and from a military point of view are a
> necessity due to the risk and high threat assessment.
> <u>The problem from our perspective is that although we
> can repeatedly say all that, when they are away from
> the oil area who really knows what they do?</u>  There is
> absolutely no way of monitoring.  To suggest such a
> thing would be a disaster and impractical and in their
> [the Government's] defence many of the other companies

---

[27] The reference to "defensive only" operations is a
reference to Talisman's and perhaps TGNBV's desire to restrict
military use of the airstrips to defensive operations only, and
to forbid use of the airstrips for any offensive operations.  As
the Talisman and TGNBV documents reflect, however, this was a
difficult line to draw, and one that it was nearly impossible for
GNPOC to enforce.

> are calling for a more "robust" attitude to the
> security threat in Block 4 and elsewhere.  I'm sorry to
> be the bearer of bad news... this problem will not go
> away no matter how many security protocols etc. are
> signed.
>
> The only improvement to the current situation would be
> at a higher level to get the gunships to operate out of
> Rubkona or have the military have their own purpose
> built facilities.  Both of those suggestions are
> fraught with difficulties, in the fact that would oil
> money build the facilities (?) and even if the gunships
> move to Rubkona, it is still an oil facility and is
> sited in the GNPOC concession.

(Emphasis supplied.)  (Question mark in original.)  The report

also noted that the dual use of the airstrip was not unique to

GNPOC.  It recited that

> Many other airports in Sudan have dual roles, El Obeid
> is a classic case where the [UN/World Food Program]
> planes operate from, and this is done alongside
> [Government] offensive operations.  When picking up
> Ambassadors this week it was plain to see 'ordnance'
> [sic] in close proximity to aid planes.

After a rebel rocket attack on the Heglig facility in August

2001, Buckee revised his assessment of the level of the threat to

GNPOC facilities and dropped his objections to the presence of

the helicopter gunships at the Heglig airstrip.  The rebels had

fired 13 rockets from eight to twelve kilometers away from the

facility.  At that point, Capeling and the TGNBV security

advisors also came to believe that the presence of helicopter

gunships at Heglig would assist in the protection of the GNPOC

oil facilities since the helicopters were useful in conducting

"reconnaissance."  Capeling sent a letter to the Government after

the attack on Heglig emphasizing the importance of securing the

safety of the people working for GNPOC.

Buckee also expressed concern about Government air attacks that were not directly related to the airstrips.  He wrote to Major General Bakri Hassan Saleh, Minister of National Defense for the Government of Sudan, on February 12, 2001, to protest bombings by the Government in the South.  The letter states that "Talisman has no capacity to verify reports of bombing, as the alleged incidents are occurring well outside our area of operations" but cautions that whatever "the military objectives may be, the bombings are universally construed as violations of international humanitarian law."  Buckee urged Saleh to "stop any bombing that has a chance of inflicting damage on civilians."

On February 20, 2002, military aircraft attacked a World Food Program site at Bieh, a town in Block 5A that a TGNBV security report described as "effectively a no-go area" for the Government.  A TGNBV security advisor wrote in a March 5, 2002 report about the incident that it was "reasonable to assume that the gunship that engaged the [World Food Program] site operated out of Unity Airstrip."

The report does not appear to be based on any first-hand observations of the attack.  Its assumption that the helicopters involved in the attack flew from the Unity airstrip seems to be drawn from reports of a white helicopter near Bieh around the time of the attack.  There was a white helicopter owned by the military that operated from the Unity airstrip.  The report also raises the possibility that the attack was triggered by the presence of SSIM, a militia group opposed to the Government, near

34

the site of the food distribution.

The only first-hand account of the attack on Bieh in evidence is from one of the plaintiffs, Reverend James Koung Ninrew ("Reverend Ninrew").[28]  Reverend Ninrew testified that he witnessed an attack that occurred in Bieh where "people were receiving foods and helicopter gunships came and attacked people; people were killed."[29]

The plaintiffs have also offered hearsay testimony from three individuals who ascribe control over helicopters to "Talisman".  Danhier, former chief of military intelligence for both the SSDF and the SPDF, testified that Sudanese intelligence officers were seconded to "Talisman" in Sudan to act as liaison officers between "Talisman" and the Sudanese armed forces.  One of those officers told Danhier that they could get him the use of a helicopter through "Talisman."

James Pui Yak ("Yak"), a Sudanese witness for plaintiffs,

---

[28] Reverend Matthew Mathiang Deang ("Reverend Deang") was in Koch, a village several miles from Bieh, on the day of the attack.  He described seeing airplanes and smoke rising from Bieh.  Chief Thomas Malual Kap ("Chief Kap") was "displaced from Bieh as a result" of the Government attack, but does not testify to having seen the attack.  Nyot Tot Rieth ("Rieth") lost her husband in the attack but did not witness it.  In their Responsive Statement, plaintiffs cite to deposition testimony about the Bieh attack by James Abelee ("Abelee"), a security officer with the World Food Program from 1996 until 2000, but the excerpts from Abelee's deposition that the plaintiffs offer do not contain a description of the attack.  Finally, the Additional Statement refers to a document that is missing from the plaintiffs' submissions.

[29] Reverend Ninrew testified that he believed the attack he witnessed occurred in 2000, but that the event he was describing was the same 2002 attack on Bieh described in the 2003 Complaint.

reported that he traveled to Nimne, a community in Block 5A, with "someone from the company" who claimed he was assessing Nimne for development projects when, in fact, Yak suspected the purpose of the trip was military intelligence.[30]  Plaintiff Chief Peter Ring Patai ("Chief Patai") reported that while he was in Nimne, "Talisman" employees came in a helicopter with a Government escort to have a community development meeting.  Two days later "Government"[31] forces attacked Nimne.

James Gatduel Gatluak ("Gatduel"), a former commander in the SPLA, testified that his forces, as well as several other militia groups, attacked Nialdhiu in Block 5A on orders from "Talisman." The orders for the attack were delivered by a person named Alwad Alnof[32] at a meeting Gatduel attended in January 2002.  Alnof said that the attack was to allow the "company to operate" and that the attack "was for the security of oil."  After the fighting, Gatduel was transported to the battle scene in a helicopter that belonged to "Talisman."  Neither Talisman nor TGNBV had any helicopters in the Sudan and there is no evidence that any Talisman or TGNBV employee had control over GNPOC

---

[30] Taylor charged that Dingley, Reading and Capeling told him that "community development is a great cover for security work."  Taylor also complained that Dingley and Reading used identification describing their work as "Community Development." As already explained, Taylor's evidence is inadmissible.

[31] Chief Patai does not explain how he could identify the allegiance of the forces that attacked Nimne two days later.

[32] The plaintiffs have not identified Alnof.  There is no reason to believe he was an employee of either Talisman, TGNBV or GNPOC.

equipment.

K.    GNPOC Effort to Extend Operations "South of the River"

In April 2001, TGNBV's Capeling led a GNPOC "brainstorming" session on the question of whether GNPOC should try to develop a plan to explore the area in Block 4 "south of the river" that had not been previously explored.  It appears that the river to which the April discussion refers cuts across the middle of the southerly portion Block 4.[33]  In Capeling's opinion, something more than half of Block 4 was under Government control, but the southern portion of the Block was not and TGNBV did not consider it "secure."[34]

TGNBV's minutes of the April meeting reflect that the goal was "to sell the project as a peaceful one or not go at all," and suggest that a plan be designed to enter the area peacefully to ensure that the "local people welcome the arrival of the oil companies."  They also reflect a report that prior efforts to cross the river to conduct seismic testing had been rebuffed by the military on the ground that it was unsafe.  The minutes add that there was "little chance" that the terms of the EPSA would require the consortium to "give up" the area if it remained

———————————

[33] The river is the Bahr-El-Arab, and can be seen on the map that shows Blocks 1, 2, 4 and 5A.

[34] The plaintiffs have not submitted Capeling's complete deposition, or even all of his testimony about the meeting.  The brief passage they have offered on this issue leaves it unclear who the other attendees of the brainstorming meeting were and whether GNPOC ever reached a decision about exploring "south of the river."

undeveloped, but that they could nonetheless show a willingness to develop the area.  In contrast to this hope for a peaceful entry into the area, a response framed by a TGNBV security officer to questions posed by the Talisman Steering Committee in May 2001 noted that oil exploration operations in the southern area of Block 4 would be "impossible" without the aerial support provided by the Government's helicopters and the "threat they pose to the rebels."

Also in April 2001, Capeling learned of reports obtained by TGNBV security officers that the Government planned to move its military forces south of the river in the next dry season. Capeling didn't know the origin of the information or whether it was reliable, but raised the report with Hassan Ali ("Ali"), the Secretary General for Sudan's Ministry of Energy and Mining,[35] who "seemed surprised and said he would raise it with the Minister."  Capeling's contemporary memorandum explains that such a movement by government forces would be "a very bad idea."

Two of the plaintiffs were displaced following April 2001 from homes located in what appears to be the area "south of the river."  Both of the plaintiffs state that they were displaced by the "Government" although neither explains how they distinguished "Government" forces from other armed groups.  These attacks did not involve helicopter gunships or bombers.

---

[35] Capeling testified in his deposition that the Government "tried to establish that the Ministry of Energy and Mining be the focal point for communication with the Government."

38

L.    Talisman Denies Knowledge of Human Rights Abuses

As described above, before its acquisition of Arakis, Talisman had learned a great deal about the nature of the conflict in the Sudan and the Government's use of violence against non-Muslim, African civilians living in or near the oil concession areas.  The TGNBV security reports and other sources kept Talisman apprised of the ongoing war effort during the time of its involvement in the Sudan.[36]  Indeed, in meetings with Sudanese Government officials, including the Minister of Mining and Energy, who was the head of the Security Council,[37] Buckee advocated against the bombing of civilian targets and encouraged the Government to use oil money for development rather than military spending.

Talisman officials nonetheless made several public statements denying knowledge of human rights abuses in the oil concession area.  In November 1999, Buckee wrote to Talisman shareholders that staff in the field "had not seen any evidence

_____

[36] TGNBV was, naturally, well informed about conditions in the field.  For example, in the Summer of 1999, Jemera Rone ("Rone"), who was researching human rights abuses in the Sudan, informed Capeling of his concern that forced displacements were occurring in the GNPOC concession area as part of an effort to establish a "cordon sanitaire" to aid in oil exploration activities.

TGNBV also hired a Sudanese lawyer, John Yor ("Yor"), to conduct an investigation into human rights abuses in the GNPOC concession that were disclosed in the Harker Report.  Yor testified that "[a]lthough I received reports of displacement during my investigation, there were many causes of the displacement."

[37] As has been previously noted, the Government's Security Council was believed to control the Government forces that operated in the GNPOC concession.

of forced displacements or relocation in our area of operations."
In May 2001, Talisman spokesman Barry Nelson ("Nelson") denied
that Talisman was aware of air attacks being launched from the
Heglig and Unity airstrips.  In April 2002, Nelson denied that
there had been displacements of large numbers of civilians
"within our concession area."  Nelson declared that "during the
time we have operated there, there have not been displacements."

M.   The Plaintiffs' Injuries

There are fifteen plaintiffs,[38] including thirteen
individuals.  All of the individual plaintiffs assert that they
were displaced, and most of them report being displaced several
times and from several locations.  Only five plaintiffs were
displaced from settlements in the three blocks within GNPOC's
concession during the time of Talisman's involvement in the
Sudan.[39]  Two of the five were displaced "south of the river" in
2001 and 2002.[40]  Eight plaintiffs were displaced from

_____

[38] This number does not include Chief Mading Majik Kiir
("Kiir"), Yien Nyinar Riek ("Riek"), and Moris Bol Majok
("Majok").  Kiir is identified as a plaintiff in the Additional
Statement but was not listed as a plaintiff in either the 2003 or
2006 Complaints.  Majok's injuries are described in both the 2003
and 2006 Complaints and he is listed in both captions.  Riek's
injuries are also described in both complaints and he is listed
in the caption of the 2003 Complaint but not the 2006 Complaint.
Neither Majok or Riek is addressed by either party in the motion
for summary judgment.

[39] Plaintiffs Stephen Kuina ("Kuina"), Luka Ayuol Yol
("Yol"), Puok Bol Mut ("Mut"), Chief Patai Tut ("Chief Tut"), and
Chief Gatluak Chiek Jang ("Chief Jang").

[40] Plaintiffs Mut and Chief Tut.

settlements in Block 5A during the time of Talisman's involvement in the Sudan; Block 5A is the concession assigned to Lundin during the time TGNBV was a Consortium Member.[41]

The plaintiffs frequently state that they have been displaced by the "Government" without giving any explanation for how they distinguished the Government forces from other armed groups.[42]  For nine of the plaintiffs, however, the link to the Government is clear.  Those nine plaintiffs were displaced by at least one attack involving gunships and/or bombers, three in the GNPOC concession area, five in the Lundin concession area, and one in both concession areas.[43]  Only plaintiffs Luka Ayuol Yol ("Yol"), Puok Bol Mut ("Mut"), and Chief Patai Tut ("Chief Tut") were displaced from the GNPOC concession area after October 1998 by gunship attacks.  Two plaintiffs were physically injured in gunship attacks, one of which occurred within the GNPOC concession.[44]  Finally, two plaintiffs were displaced before

---

[41] Plaintiffs Yol, Chief Jang, Rieth, Reverend Deang, Reverend Ninrew, Chief Kap, Chief Tunguar Kueigwong Rat ("Chief Rat") and Chief Patai.

[42] While Talisman argues that several of the plaintiffs were not actually displaced by the attacks that they describe because they owned other homes or chose to leave voluntarily, the plaintiffs are entitled to the inference that they were displaced and it was the attack that caused their displacement.

[43] Plaintiffs Kuina, Mut, and Chief Tut in Blocks 1, 2 & 4; Reverend Ninrew, Chief Rat, Chief Kap, Chief Jang and Chief Patai in Block 5A; Yol in both concession areas.

[44] Mut was shot by a gunship in an attack in Block 4.  Chief Patai was injured by a bomb from an Antonov in Block 5A.  Rieth's husband Joseph Thiet Makuac was killed in the attack on Bieh in Block 5A and she is bringing a claim on his behalf.

Talisman acquired Arakis.[45]  The injuries suffered by each
individual plaintiff follow, beginning with the three plaintiffs
who were displaced from the GNPOC concession after October 1998
by gunship attacks: Yol, Mut, and Chief Tut.

Yol was captured and tortured by Government soldiers in 1999
in Biem, which is in Block 1.  Yol was first displaced from
Athonj[46] in November 1997, by Government troops and militia
soldiers using tanks, bombers and gunships.  He fled to Panlok,
in Block 1, but was displaced one week later by helicopter
gunships.  In May 1999, he was displaced from Panchien in Block 1
by Government ground troops and bombers and gunships.  Yol fled
to Pagol in Block 1, which was attacked in March 2000 by
Government soldiers, gunships and bombers.  Yol fled Pagol for
Nyador, which is in Block 5A.  Nyador was attacked in February
2001 by bombers, and Yol fled to Chongonack, also located in 5A.

Mut is a member of the Parliament of Southern Sudan.  Mut
was displaced from a series of villages in Block 4 between 1998
and 2002[47] by the "Government" and allied militias.  Three of the
attacks that displaced Mut, attacks on Nooriak in 1998 and 1999

---

[45] Fatuma Nyawang Garbang and Stephen Hoth.

[46] The Court has been unable to locate Athnoj on any of maps
provided by the parties.

[47] Mut was displaced from Mankien, Wangkei, Nooriak, Kotrial
Bek, and Lara.  In his response to defendant's interrogatory, Mut
also claimed to have been displaced from Kualkony, Wicok and
Boaw, but has offered no other evidence to support those claims.

and Lara in 2002, included bombers and gunships.[48]  Mut was shot
in the right shoulder by a gunship during an attack at Lara in
2002.

Chief Tut is the Chief of Mayom County.  Chief Tut was
displaced from several villages in Block 4 in 2000 and 2001 by
"Government" attacks.[49]  Two of the displacements, from Mankien
and Kernyang, were caused by attacks that included helicopter
gunships and Antanovs.  Chief Tut was shot in the right leg
during an attack by Murahaleen militia near Kernyang in 2000.[50]

Two other plaintiffs were displaced from the GNPOC
concession after October 1998: Stephen Kuina ("Kuina") and Chief
Gatluak Chiek Jang ("Chief Jang").  Kuina is a nurse from the
Nuer tribe, and a member of the Sudanese Parliament.  He was
displaced from Pibor in Block 4 in 1995 by the Government and
Murahaleen.  Kuina moved to Mankien, also in Block 4, where he
was again displaced in October 1998 by fighting that included
bombardment by Antanov bombers.  Kuina attempted to stay in
Ruathnyibol in Block 4 and built a shelter there, but was
displaced by ground troops who did not wear uniforms and did not

---

[48] Mut testified that two of the attacks that displaced him,
attacks on Nooriak in 1998 and 1999, included bombers and
gunships.  At his deposition in June 2004, Mut testified that he
first saw a gunship in 2002.

[49] Chief Tut was displaced from Mankien, Kotrial Bek,
Kernyang, Ngonp, Lara, Mayen Jur and Thiek.  There is no evidence
to explain how Chief Tut knew the attacks that displaced him were
by Government forces.

[50] Murahaleen are an arab militia, made up of retired army
officers, who often ride on horseback.

use vehicles.  Upon leaving Ruathnyibol, Kuina took up residence
in a displaced person's camp in Maper, which is outside of Unity
State and the oil concession area.  Kuina stayed in Maper until
2000.  In the camp in Maper, there were shortages of food and
medicine, but there were no violent attacks.  Kuina attempted to
return to Unity State in 2000, building shelters for himself and
his family in a number of locations including Pibor, Tuchneina,
Kerial, Byei, Lara, Toy, Tam and Mayen Jur, all in Block 4, but
was displaced each time.  Kuina chose these locations because he
had heard that there were no helicopter gunships in those
locations.[51]

     Chief Jang is a chief of the Leek tribe.  Chief Jang was
displaced from Chotjara in Block 5A in July 1999, by bombers,
gunships, and Government ground troops.  Chief Jang went to
Mankien in Block 4, but was displaced from Mankien by the
"Government" in August 1999.  Chief Jang returned to Chotjara in
December 1999, was again displaced by "Government" forces in
2000, but returned again.[52]  In October 2001, he was displaced
from Chotjara for a third time by bombers, gunships and
Government ground troops.  Chief Jang returned to Chotjara yet
again, and was displaced when Chotjara was attacked in December

---

     [51] Kuina describes being displaced by fighting from each of
these places but not helicopter or gunship attacks.

     [52] There is no evidence to establish how Chief Jang knew
that the forces that attacked Mankien in August 1999 and Chotjara
in 2000 were from the Government.

2002 by bombers, gunships, tanks and Government ground forces.[53]

Eight plaintiffs were displaced from communities in Block 5A.  Two of those plaintiffs, Yol and Chief Jang, were also displaced from the GNPOC concession and their injuries have already been described above.  Nyot Tot Rieth ("Rieth"), a member of the Nuer tribe, was displaced from a village near Leer in Block 5A in 2002 when her village was burned by "Arabs".  Rieth did not see any vehicles or aircraft at the time of the attack.  Rieth's husband was killed in a bombing attack in Bieh in Block 5A in 2002, and Rieth seeks compensation as his surviving spouse.  Rieth was not present during the attack that killed her husband.

Reverend Matthew Mathiang Deang ("Reverend Deang") is a member of the Southern Sudan Parliament, the Presbyterian Church of Sudan and the New Sudan Council of Churches.  Reverend Deang was displaced by a raid on Gany, which is located in Block 5A, in September 1999.[54]  Reverend Deang testified at his deposition in November 2003 that Gany was attacked by the Government.  In his May 9, 2006 declaration he asserts that a militia group attacked Gany.  Reverend Deang was also displaced from Koch in Block 5A in September 1999 by a "Government" attack.

Reverend Ninrew is an education co-ordinator and pastor in

_____

[53] Chotjara is located in the County of Nhialdiu.  There is some confusion, based on Chief Jang's deposition testimony, about whether he was also displaced from the village of Nhialdu in Nhialdiu county.  Chief Jang states in his May 2006 declaration that in his deposition, when he referred to Nhialdiu, he was referring to Nhialdiu county.

[54] Reverend Deang was not actually present for the raid on Gany.

the Presbyterian Church of Sudan.  Reverend Ninrew was displaced
from Koch in Block 5A in 1995 by a Government attack that
included helicopters and bombers.  He returned to Koch a month
later and remained in Koch until 1998.  In 1998, Reverend Ninrew
left Koch after becoming aware of an attack on Liech, which is
two hours from Koch.  Reverend Ninrew could hear artillery, and
could see and hear Antanovs and helicopter gunships during the
attack on Liech.  Reverend Ninrew went to Thornyor in Block 5A,
where he was displaced later in 1998 by another attack by
"Government of Sudan" forces.

Chief Tunguar Kueigwong Rat ("Chief Rat") is the Paramount
Chief of the Leek Nuer.  Chief Rat was displaced from Nhialdiu in
Block 5A[55] in 2002[56] by an attack by Government soldiers on foot,
horseback and in vehicles, including tanks, with support from
bombers and gunships.

Chief Thomas Malual Kap ("Chief Kap") is a member of the
Nuer tribe.  He was displaced from Koch, located in Block 5A,
repeatedly from 1998 to 2003.  Chief Kap was first displaced from
Koch in 1998, by a Government attack involving gunships, tanks
and ground troops.  After the 1998 attack, Chief Kap returned to

---

[55] Nhialdu appears to be in Block 5A.  This is consistent
with Chief Rat's testimony.  The Responsive Statement asserts
that Nhialdiu is a name of an area that overlaps Blocks 5A and 4,
but does not point to any evidentiary support for that assertion.

[56] In a February 2004 response to interrogatories, Chief Rat
reported that he was displaced from Biel in 1998.  In his July
2004 deposition, however, Chief Rat testified that he had
voluntarily left Biel for Nhialdiu in 1999.

Koch but was forced to flee by a Government attack that included helicopter gunships.  After the second attack, Chief Kap again returned to Koch, only to be chased away by a third "Government" attack.  After the third attack, Chief Kap fled to Pultuni.  From Pultuni he was displaced to Mirmir, and then from Mirmir was displaced to Bieh.  Chief Kap built shelters in each place but was forced to leave by Government forces.  All three are in Block 5A.  Chief Kap was displaced from Bieh by a Government attack during a food distribution by the World Food Program.  In 2001, Chief Kap was shot in the foot by a Government soldier in an attack on Ngony in Block 5A.[57]

Chief Patai is the Paramount Chief of the Nuer tribe.  Chief Patai and his community moved away from Duar in Block 5A in 2000 based on information that they would be attacked to make room for construction of an all-weather road.[58]  He was displaced from Nimne in Block 5A in February 2002, by an attack by bombers and gunships.  Chief Patai was injured in the attack on Nimne when he was hit in the left leg by shrapnel from a bomb and was hit in the head and right eye by wood from his house that was dislodged by a bomb.

Two plaintiffs were displaced before Talisman acquired

---

[57] The soldiers in the attack on Ngony were supported by helicopter gunships.

[58] The decision was also based on reports of other Government attacks.  In his response to defendant's interrogatories Chief Patai claims also to have been displaced from Duer in 1999, however, plaintiffs have failed to submit evidence of this displacement.

Arakis: Stephen Hoth ("Hoth") and Fatuma Nyawang Garbang
("Garbang").  Hoth, who is presently a student in the seminary at
Creighton University, moved to Khartoum in 1988 to attend school.
In June 1998, Hoth attempted to travel to see his family in Pibor
in Block 4.  Hoth only got as far as Mayom in Block 4 where he
was stopped by Government and militia forces.  Hoth waited for
two months for the opportunity to continue to Pibor.  In August
1998, Hoth went to Heglig to look for work from the oil
companies, and returned to Khartoum in September 1998.  Hoth left
Khartoum for Egypt in December 1998 because of his concern that
he would be forced to join a militia group.

Garbang is a refugee living in Illinois and working as a
translator and a tutor.  Garbang was shot in the leg by a
Government soldier in Leer in Block 5A in 1994, and driven from
her home.  Garbang attempted to reestablish a home in Leer three
times between 1997 and 1999, but did not do so after being told
that the area was "totally controlled."

There are two institutional plaintiffs.  Plaintiff Nuer
Community Development Services in USA ("NCDS") is a non-profit
Minnesota corporation and alleges as damages its payments to
displaced persons, although not to any of the named plaintiffs.
NCDS is not an alien and may not bring suit under the ATS.  See
Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995).  The
plaintiffs do not contest dismissal of this claim.

The Presbyterian Church of Sudan ("Presbyterian Church")
claims the loss of 64 churches due to Government attacks.  The

only evidence of its property loss comes through the testimony of three of the named plaintiffs, who describe damages to churches in thirteen different communities.  Only one of the churches was damaged during an aerial attack, and that attack occurred in Block 5A.

Reverend Ninrew saw five damaged churches.[59]  Only one church showed damage from an air attack, that church, which is located in Leer in Block 5A, was "destroyed by bombs."[60]  Deang was told by Chief Rat about soldiers putting a man into a burning church in Nhiadliu in Block 5A but there is no evidence that the soldiers were from the Government.  Chief Jang saw churches that "had been burned by Government of Sudan forces" in villages in both Block 4 and Block 5A[61] but did not explain how he knew that it was Government forces that burned the churches.

---

[59] None of the churches identified by Ninrew were listed as having been damaged in the Presbyterian Church's response to defendant's interrogatories.

[60] The other four damaged churches were all built from thatch and had been either "severely damaged" or "burned." Reverend Ninrew attributes the damage to Government soldiers and allied militia but fails to explain how he knew who damaged the churches.  Reverend Ninrew did not testify that he saw the attacks that damaged the churches.  The other four churches were in Koch, Thornyor, Rier and Nyal.  Koch and Thornyor are located in Block 5A and Nyal is in Block 5B, a concession block east of Block 5A.  It is unclear whether Rier is in Block 5A or Block 4.

[61] The churches are in the villages of Chotjara, Wangrial, Riew, Biel, Bar Malual, Nyawal, Wanguar, and Wangtuak.   Three of the churches (Chotjara, Wangrial, and Biel) were not identified in the Presbyterian Church's response to defendant's interrogatories.

**Discussion**

I.   Motion for Summary Judgment

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the
court must view all facts in the light most favorable to the
nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
"A material fact is one that would affect the outcome of the suit
under the governing law, and a dispute about a genuine issue of
material fact occurs if the evidence is such that a reasonable
factfinder could return a verdict for the nonmoving party."
GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc., 449
F.3d 377, 381 (2d Cir. 2006) (citation omitted).  The parties'
summary judgment submissions "shall set forth such facts as would
be admissible in evidence," and when the moving party has
demonstrated the lack of material factual dispute, the opposing
party must "set forth specific facts showing that there is a
genuine issue for trial," and cannot rest on the "mere
allegations" of the pleadings.  Fed. R. Civ. P. 56(e); accord
Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83,

50

91 (2d Cir. 2002).[62]  Thus, the evidence put forth by the non-
movant to survive summary judgment must be admissible and the
"principles governing admissibility of evidence do not change on
a motion for summary judgment."  Raskin v. Wyatt, 125 F.3d 55, 66
(2d Cir. 1997); see Lasalle Bank Nat'l Ass'n v. Nomura Asset
Capital Corp., 424 F.3d 195, 205-06 (2d Cir. 2005).

Talisman has moved for summary judgment on the claims
presented against it in the 2003 Complaint.  These claims are
that Talisman violated the customary international law relating
to genocide, torture, war crimes, crimes against humanity, and
the treatment of ethnic and religious minorities and their
property, and that Talisman conspired with and aided and abetted
its sole co-defendant, the Republic of Sudan, to commit those
same violations of customary international law.  The plaintiffs
do not oppose the motion for summary judgment to the extent that
it is addressed to Talisman's direct liability for violations of
customary international law.  Therefore, it is only necessary to
address whether Talisman has shown that it is entitled to summary
judgment on the claims of conspiring with and aiding and abetting
the Government.


A.   Conspiracy

Talisman has moved for summary judgment on the claim that it

---

[62] The plaintiffs urge a standard for summary judgment that
would significantly reduce their burden, by among other things
allowing them to rely on inadmissible evidence.  Their
application to alter the standard for a summary judgment motion
is rejected.

conspired with the Government to commit violations of
international law.  Although the 2003 Complaint does not include
a claim of conspiracy, it does include in its text an allegation
that Talisman conspired with the Government to carry out a
campaign of ethnic cleansing, including extrajudicial killing,
war crimes, forcible displacement, military bombings and assaults
on civilian targets, confiscation and destruction of property,
kidnaping, rape, and enslavement against the non-Muslim, African
Sudanese population living in and near the oil concession areas.

In opposition to the motion for summary judgment, the
plaintiffs have described the conspiracy that they intend to
prove at trial as follows.  The conspiratorial agreement, formed
between the Government and Arakis, was to clear the oil
concession and surrounding area of all non-Muslim, African
civilians.  Talisman joined the conspiracy to displace residents
with knowledge of its goal, and furthered its purpose principally
by (a) designating new areas for oil exploration understanding
that that would require the Government to "clear" those areas,
(b) paving and upgrading the Heglig and Unity airstrips with
knowledge that Government helicopters and bombers would use them
in launching attacks on civilians, and (c) paying royalties to
the Government with the knowledge that the funds would be used to
purchase weaponry.

Knowing participation in a forcible transfer of population,
when part of a widespread or systematic attack directed against a
civilian population, is a crime against humanity and a violation

52

of customary international law.  See Presbyterian Church, 226
F.R.D. at 480-81.  The plaintiffs argue that, having joined the
conspiracy to displace a population, Talisman is liable for the
acts of all other conspirators taken in furtherance of the
conspiracy, which it identifies as the "well-settled" law of
conspiracy articulated in Pinkerton v. United States, 328 U.S.
640, 646-47 (1946).  It locates evidence that the Pinkerton
doctrine is recognized in international law in a judgment of the
trial chamber of the International Criminal Tribunal for Rwanda
("ICTR") in Prosecutor v. Nahimana, Case No. ITCR-99-52-T,
Judgement and Sentence, ¶ 1045 (Trial Chamber, Dec. 3, 2003).
Under the Pinkerton doctrine, a "defendant who does not directly
commit a substantive offense may nevertheless be liable if the
commission of the offense by a co-conspirator in furtherance of
the conspiracy was reasonably foreseeable to the defendant as a
consequence of their criminal agreement."  United States v.
Bruno, 383 F.3d 65, 89 (2d Cir. 2004) (citation omitted).

    The plaintiffs misconstrue the reach of international law in
at least two respects.  First, the offense of conspiracy is
limited to conspiracies to commit genocide and to wage aggressive
war.  Second, international law does not recognize a doctrine of
conspiratorial liability that would extend to activity
encompassed by the Pinkerton doctrine.

    The starting point for this discussion must be Sosa, 542
U.S. at 692.  In Sosa, the Court explained that a claim under the
"present-day law of nations" may form the basis for an ATS claim

only to the extent it rests "on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" that Congress had in mind when it enacted the ATS.  <u>Id</u>. at 725.

While international law has recognized since the prosecution of Nazi war criminals that liability can be based on participation in a conspiracy, <u>Presbyterian Church</u>, 244 F. Supp. 2d at 322, as of today international law applies the charge of conspiracy in only two circumstances: "conspiracy to commit genocide and common plan to wage aggressive war."  <u>Hamdan v. Rumsfeld</u>, 126 S.Ct. 2749, 2784 (2006).[63]  Indeed, in <u>Nahimana</u>, the defendants were charged with conspiring to commit genocide. <u>Nahimana</u>, Judgement and Sentence at ¶¶ 8-10, ¶¶ 1040-55.

A conspiracy to wage aggressive war was the first offense to be recognized in international law.  Although the statute underlying the military tribunals following World War II was broadly worded and stated that "Leaders, organizers, instigators and accomplices participating in the formulation or execution of a common plan or <u>conspiracy</u> to commit any of the foregoing crimes are responsible for all acts performed by any person in execution of such a plan," in fact, the charges of conspiracy that were

---

[63] In observing that the only conspiracy crimes recognized by "international war crimes tribunals" were "conspiracy to commit genocide and common plan to wage aggressive war, which is a crime against the peace and requires for its commission actual participation in a concrete plan to wage war," <u>Hamdan</u> noted that the jurisdiction of such tribunals "often extends beyond war crimes proper to crimes against humanity and crimes against the peace."  <u>Hamdan</u>, 126 S.Ct. at 2784 (citation omitted).

brought were limited to conspiracy to commit aggressive war and applied only to Hitler's senior leadership.  Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis Powers and Charter of the International Military Tribunal, art. 6, Aug. 8, 1945, 59 Stat. 1544, 1547, 82 U.N.T.S. 279, 288 ("Nuremberg Charter") (emphasis supplied); see also Allison M. Danner & Jenny S. Martinez, Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law, 93 Cal. L. Rev. 75, 116 (2005) ("Danner, Guilty Associations").  The charge of conspiracy was rejected at that time as a basis for imposing liability for either crimes against humanity or war crimes.  Hamdan, 126 S.Ct. at 2784 & n.39; see also Danner, Guilty Associations, at 116; International Military Tribunal (Nuremberg), Judgment and Sentences, Oct. 1, 1946, reprinted in 41 Am. J. Int'l L. 172, 221-24 (1947).

Since World War II, the only other context in which the charge of conspiracy has been recognized in international law has been when the object was to commit genocide.  Brief for Specialists in Conspiracy and International Law as Amicus Curiae Supporting Petitioner at 11, Hamdan v. Rumsfeld, 126 S.Ct. 2749 (2006) (05-184) ("Conspiracy Amicus").  None of the recently established international criminal tribunals (to wit, the International Criminal Tribunal for the former Yugoslavia ("ICTY"), the ICTR or International Criminal Court ("ICC")), have been authorized to try defendants for the crime of conspiracy

55

outside the context of genocide; both the ICTY and ICTR have been authorized by statute to try defendants for conspiring to commit genocide.  Id.; see also Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, Between 1 January 1994 and 31 December 1994, S.C. Res. 955, U.N. SCOR, 49th Sess., 3453d mtg., art. 2, U.N. Doc. S/RES/955 (1994) ("ICTR Statute"); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991, S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., art. 4, U.N. Doc. S/RES/827 (1993) ("ICTY Statute"); Presbyterian Church, 226 F.R.D. at 479.

As of today, therefore, liability under the ATS for participation in a conspiracy may only attach where the goal of the conspiracy was either to commit genocide or to commit aggressive war.[64]  The plaintiffs no longer contend that Talisman conspired with the Government to commit genocide; they have never

---

[64] In Cabello v. Fernandez-Larios, 402 F.3d 1148 (11th Cir. 2005) (per curiam), the Eleventh Circuit recognized conspiracy liability under the ATS for a number of violations of international law including crimes against humanity.  Id. at 1159.  As the plaintiffs point out in their brief, the Eleventh Circuit erred in doing so by drawing on domestic law, and not international law.  Because this Court continues to believe that international law must supply the substantive law for plaintiffs' claims it declines to follow Cabello.

claimed that it conspired to commit aggressive war.  As described above, they contend that Talisman joined a conspiracy to commit a crime against humanity, specifically, a widespread and systematic attack on a civilian population to displace it forcibly.[65]  As a result, the defendants' motion for summary judgment on the conspiracy claim is granted.

It should also be noted before leaving this subject, however, that even if the plaintiffs continued to press a claim that Talisman conspired to commit genocide, they would not be able to rely on the Pinkerton doctrine to impose liability on Talisman.  "The Anglo-American concept of conspiracy was not part of European legal systems," Hamdan, 126 S.Ct. at 2784 (citation omitted), at the time of the Nuremberg tribunals, and has never found acceptance in international law.[66]  While both the ICTY and ICTR Statutes recognize conspiracy as a mode of imposing liability for the crime of genocide, neither statute contains language supporting the application of the Pinkerton principle.

---

[65] To the extent that the plaintiffs' brief in opposition to this motion can also be read to argue that the plaintiffs believe that they have evidence to show the intentional targeting of civilians, that conduct may constitute a war crime.  For the reasons already explained, however, Talisman could not be charged under the ATS with conspiring to participate in that war crime.

[66] The Nuremberg Charter included language that embraced the Pinkerton principle, Nuremberg Charter, art. 6, but the International Military Tribunal ("IMT") which implemented that charter refused to embrace the Pinkerton principle.  See Conspiracy Amicus at 15 (noting that the pattern of the convictions of Rudolph Hess is evidence that the Pinkerton principle was not applied by the IMT); see also Danner, Guilty Associations at 116 (observing that the IMT judges "endorsed a restrictive notion of conspiracy").

Thus, Talisman could not be held liable under the ATS for the conduct of a co-conspirator merely because that conduct was foreseeable.[67]

Talisman has also been sued in its capacity as a successor to Arakis.  This appears to relate to the plaintiffs' contention that the conspiracy to displace non-Muslim Africans originated in an agreement between Arakis and the Government, and that when Talisman acquired Arakis, it joined the conspiracy and became liable for conspiratorial acts committed by Arakis and the Government before the acquisition.  For the reasons already explained, the conspiracy claim must be dismissed as well to the extent it is brought against Talisman as a successor to Arakis.

B.   Aiding and Abetting

Talisman has also moved for summary judgment on the plaintiffs' sole remaining claim, the claim that Talisman aided and abetted the Government in committing genocide, torture, war crimes, and crimes against humanity.  This Court has previously referred to the Ninth Circuit's finding that there is a "settled, core notion of aider and abettor liability in international law" that requires a plaintiff to show "knowing practical assistance or encouragement which has a substantial effect on the

_____

[67] The plaintiffs cite to <u>Nahimina</u> as evidence of the ICTR's adoption of the <u>Pinkerton</u> principle, but do not point to any passage in the 240-page decision that supports this view.  The passage they do quote addresses whether an agreement may be inferred from circumstantial evidence, which is a separate and uncontroversial proposition.  <u>See</u> <u>Nahimina</u>, Judgement and Sentence at ¶ 1045.

perpetration of the crime." <u>Talisman</u>, 374 F. Supp. 2d. at 340

(citing <u>Doe I v. Unocal Corp.</u>, 395 F.3d 932, 951 (9th Cir.

2002)).  To address the issues presented by Talisman's motion, it

is appropriate to set forth the elements of aiding and abetting

liability under international law with more precision.


1.   <u>The Elements of Aiding and Abetting Liability Under</u>
     <u>International Law</u>

     The ICTY, ICTR and ICC each impose liability on individual

defendants for aiding and abetting the commission of a crime.

ICTY Statute at 7(1); ICTR at 6(1); Rome Statute of the

International Criminal Court, United Nations Diplomatic

Conference of Plenipotentiaries on the Establishment of an

International Criminal Court, July 17, 1998, art. 25(3), U.N.

Doc. A/CONF.183/9 (1998) ("Rome Statute").  For example, the ICTY

Statute provides that a "person who planned, instigated, ordered,

committed or otherwise <u>aided</u> <u>and</u> <u>abetted</u> in the planning,

preparation or execution of a crime referred to in articles 2 to

5 of the present Statute, shall be individually responsible for

the crime."[68]  ITCY Statue at art. 7(1) (emphasis supplied).

     The Rome Statute provides that:

<u>Article 25</u>
Individual Criminal Responsibility

3.   In accordance with this Statute, a person shall be

---

[68] Articles 2 through 5 refer to the specific crimes
described in the ITCY Statute, to wit, Grave breaches of the
Geneva Conventions of 1949, Violations of the laws or customs of
war, Genocide, and Crimes against humanity.  ICTY Statute at art.
2-5.

criminally responsible and liable for punishment for a
crime within the jurisdiction of the Court if that
person:
...
(c) For the purpose of facilitating the commission of
such a crime, <u>aids, abets or otherwise assists</u> in its
commission or its attempted commission, including
providing the means for its commission.
...

<u>Article 30</u>
Mental Element
1.    Unless otherwise provided, a person shall be
criminally responsible and liable for punishment for a
crime within the jurisdiction of the Court only if the
material elements are committed <u>with intent and
knowledge</u>.

2.    For purposes of this article, a person has intent
      where:
      (a)   In relation to conduct, that person means to
            engage in the conduct;
      (b)   In relation to a consequence, that person means to
            cause that consequence or is aware that it will
            occur in the ordinary course of events.
3.    For the purposes of this article, "knowledge" means
      awareness that a circumstance exists or a consequence
      will occur in the ordinary course of events.  "Know"
      and "knowingly" shall be construed accordingly.

Rome Statue at art. 25, 30 (emphasis supplied).

    The Appeals Chamber of the ICTY has described the <u>actus reus</u>

of aiding and abetting as requiring that the accused carry out

"acts <u>specifically directed</u>[69] to assist, encourage or lend moral

---

    [69] The use of the phrase "specifically directed" in
<u>Vasiljevic</u>, Feb. 25 Judgement, at ¶ 102(i), may have been
designed to address the issue of whether assistance must be
"direct".  In <u>Prosecutor v. Tadic</u>, Case No. 94-1-T, Opinion and
Judgment (Trial Chamber, May 7, 1997), the ICTY trial court had
conducted an extensive survey of the international precedent,
focusing particularly on the Nuremberg trials, and had concluded
that assistance which "directly and substantially affected the
commission" of an offence would support aiding and abetting
liability.  <u>Id</u>. at ¶ 692.  At least one trial chamber opinion has
declined to require that assistance be both "direct" and
"substantial", concluding that "the use of the term 'direct' in
qualifying the proximity of the assistance and the principal act

support to the perpetration of a certain specific crime" and that this support have "a substantial effect upon the perpetration of the crime." Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Judgement, ¶ 102(i) (App. Chamber, Feb. 25, 2004) (emphasis supplied). The mental element of the crime of aiding and abetting or mens rea is defined as "knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal." Id. at ¶ 102(ii). To have a "substantial effect" it is not necessary to show that assistance constituted an indispensable element of the crime, only that "the criminal act most probably would not have occurred in the same way had not someone acted in the role the accused in fact assumed." Talisman, 244 F. Supp. 2d. at 324 (citing Prosecutor v. Tadic, Case No. 94-1-T, Opinion and Judgment, ¶ 688 (Trial Chamber, May 7, 1997)).

The application of aiding and abetting liability is not novel. The theory of liability was used following World War II, and contemporary courts still draw on that precedent, citing among other cases the accusation made by the British Military against three individuals for supplying the poison gas used for the extermination of allied nationals interned in concentration

---

to be misleading as it may imply that assistance needs to be tangible, or to have a causal effect on the crime." Prosecutor v. Furundzija, Case No. IT-95-17/1-T, Judgement, ¶ 232 (Trial Chamber, Dec. 10, 1998). Requiring that the acts of the aider and abettor be "specifically directed" to assist the principal requires that the action of the aider be deliberate and intentional without creating confusion about the practical impact of the action.

camps.  The prosecution was required to prove that the defendants knew that the gas would be used to kill human beings.  See Prosecutor v. Furundzija, Case No. IT-95-17/1-T, Judgement, ¶ 222 (Trial Chamber, Dec. 10, 1998); Tadic, May 7 Opinion and Judgment at ¶ 680.

Far more recently, in Vasiljevic, the Appeals Chamber for the ICTY found the appellant guilty of aiding and abetting the crimes of murder and persecution based on his participation in the murder of five Muslim men at the Drina River in Bosnia and Herzegovina in 1992.  While armed, the appellant escorted the victims to the river bank and prevented their escape before they were shot and killed by others.  Vasiljevic, Feb. 25 Judgement at ¶¶ 1, 134, 147.  The Appeals Chamber found that the evidence established that the appellant knew that the principal perpetrators of the crimes intended to commit the crimes of murder and discrimination, and that armed with that knowledge he assisted the commission of the crimes in a way that had a "substantial effect upon the perpetration of the crimes" at a time when he was "fully aware that his participation assisted the commission" of the crimes.  Id. at ¶¶ 134-35, 142-43 (citation omitted).

The articulation of aiding and abetting liability in Vasiljevic has been adopted by the Appeals Chamber of the ICTY in subsequent decisions.  See Prosecutor v. Kvocka, Case No. IT-98-30/1-A, Judgement, ¶ 89 (App. Chamber, Feb. 28, 2005), and Prosecutor v. Blaskic, Case No. IT-95-14-A, Judgement, ¶ 45 (App.

Chamber, July 29, 2004).  It also finds its roots in prior
Appeals Chambers' decisions.  See Prosecutor v. Aleksovski, Case
No. IT-95-14/1-A, Judgement, ¶ 163 (App. Chamber, Mar. 24, 2000);
Prosecutor v. Tadic, Case No. IT-94-1-A, Judgement, ¶ 229 (App.
Chamber, July 15, 1999).[70]

The international law of aiding and abetting liability
closely parallels federal criminal law.  Under federal law, a
prosecutor must show the presence of two separate mental
elements: knowledge and intent.  Criminal culpability exists
under federal law where it is shown that "the defendant knew of
the crime, and that the defendant acted with the intent to
contribute to the success of the underlying crime."  United
States v. Reifler, 446 F.3d 65, 96 (2d Cir. 2006); see also In re
South African Apartheid Litig., 346 F. Supp. 2d. 538, 551 n.14
(S.D.N.Y. 2004).  The prosecutor must also show that the
defendant's efforts "contributed towards" the success of the
criminal venture.  Reifler, 446 F.3d at 96 (citation omitted).

Aiding and abetting liability is a specifically defined norm
of international character that is properly applied as the law of
nations for purposes of the ATS.  See Sosa, 542 U.S. at 725.  To
show that a defendant aided and abetted a violation of
international law, an ATS plaintiff must show:

_____

[70] This Court has already observed that the Appeals Chambers
of both the ICTR and ICTY are "endowed with the power to review
and reverse Trial Chamber decisions for errors of law" and that
where there are "inconsistencies between Trial Chamber decisions
and Appeals Chamber decisions, decisions of the Appeals Chamber
are authoritative."  Presbyterian Church, 374 F. Supp. 2d. at
340.

1)    that the principal violated international law;

2)    that the defendant knew of the specific violation;

3)    that the defendant acted with the intent to assist that violation, that is, the defendant specifically directed his acts to assist in the specific violation;

4)    that the defendant's acts had a substantial effect upon the success of the criminal venture; and

5)    that the defendant was aware that the acts assisted the specific violation.

The plaintiffs have not identified sufficient evidence to raise a material question of fact that Talisman can be found liable for aiding and abetting the Government in the commission of genocide, crimes against humanity, or war crimes, because among other things they have not identified evidence that Talisman itself performed any act that could be construed as substantial assistance to the Government in its violation of international law.  After briefly addressing the genocide claim, the following discussion will describe the elements of the remaining two claims and the plaintiffs' evidence that Talisman knew of the Government's criminal activity.  The discussion of the intent and substantial assistance elements follows.  At the conclusion, there is a discussion of the causation issues which affect each claim.

64

2.  Genocide

The plaintiffs' brief in opposition to the summary judgment motion largely ignores the claim that Talisman aided and abetted genocide.  They do not contend that Talisman acted with intent to or was aware that its acts did assist genocide.  Instead the plaintiffs focus their energies on the claims that Talisman aided and abetted crimes against humanity and war crimes.  The plaintiffs essentially confine their discussion of genocide to a dispute about the admissibility of a congressional finding of genocide.  A brief discussion of the genocide claim will therefore suffice.

Genocide is defined as:

any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
  (a) Killing members of the group;
  (b) Causing serious bodily or mental harm to members of the group;
  (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
  (d) Imposing measures intended to prevent births within the group;
  (e) Forcibly transferring children of the group to another group.

Presbyterian Church, 226 F.R.D. at 478 (citing to Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, art. 2, 102 Stat. 3045, 3045, 78 U.N.T.S. 277, 280) (emphasis supplied); see also Kadic, 70 F.3d at 241.  The intent element of genocide may be inferred from "evidence of a perpetrator's knowing participation in an organized or extensive attack on civilians."  Presbyterian Church, 226 F.R.D. at 479

65

(citation omitted).

The parties dispute whether the plaintiffs have provided any admissible evidence that the Government was committing genocide in the southern Sudan.[71]   There is no evidence that any international body has found that genocide has occurred in southern Sudan, nor that the United States Department of State has made such a finding.   The plaintiffs rely exclusively on the Congressional finding of genocide in the Sudan Peace Act, Pub. L. No. 107-245, 116 Stat. 1504 (codified at 50 U.S.C. § 1701). Talisman argues that as a conclusion of law, unsupported by a factual investigation, the "finding" of genocide is not admissible under Rule 803(8)(c), Fed. R. Evid.   See Gentile v. County of Suffolk, 926 F.2d 142, 148 (2d Cir. 1991).

The plaintiffs also have difficulty showing that Talisman was on notice that genocide was occurring during the period of its investment.   Their best evidence appears to be a conversation in 1998, before the investment, in which the former head of Arakis security told Talisman that it was his belief that if Talisman entered Sudan "the exploitation of the oil fields would be successful," that the resulting oil revenues would tip the military balance in the Sudan in favor of the Government, and that as a result "there would be no hope for the survival of the southern Christian community because they would not have resources to defend themselves."   To the extent that this was

---

[71] Many international bodies have labeled the Government's conduct in western Sudan, known as Darfur, as genocide.   This lawsuit does not allege any complicity in those acts.

understood at the time as a statement about the physical survival of a population, then this may be construed as notice of a risk that the Government would engage in a campaign of genocide.[72]

The plaintiffs have not pointed to evidence that Talisman knew or should have understood during the period of its investment in oil development in the southern Sudan that the Government was engaged in genocide, as opposed to the forcible displacement of a population, for example.  A claim of genocide is an extremely serious matter, and to survive summary judgment on such a claim requires evidence not only that genocide was occurring but also evidence that reasonably supports an inference that Talisman understood that to be so and understood that the acts performed by Talisman that the plaintiffs contend constituted substantial assistance were acts that facilitated genocide and were intended by Talisman to do so.  While issues of knowledge and intent are exquisitely fact intensive inquiries, and not typically appropriate for resolution on summary judgment, it is nonetheless incumbent on a plaintiff to point to evidence from which a reasonable juror could infer those states of mind. The plaintiffs have pointed to no such evidence, circumstantial or otherwise.  Talisman is entitled to summary judgment on the claim that Talisman aided and abetted genocide.

---

[72] The plaintiffs have shown that Talisman was aware of reports in 1999 that the National Islamic Front, the ruling party in Sudan, was committed to a policy of jihad that included "enforced Arabization" of citizens in the south.  The plaintiffs have not addressed whether jihad or enforced Arabization refers to the cultural or physical eradication of a group.

67

3.   Crimes Against Humanity

Crimes against humanity include murder, enslavement, deportation or forcible transfer,[73] torture, rape or other inhumane acts, committed as part of a widespread and systematic attack directed against a civilian population.   Presbyterian Church, 226 F.R.D. at 480-81.   A widespread attack is one conducted on a large scale against many people, while a systematic attack is an organized effort to engage in the violence.   Id. at 481 (citing to Prosecutor v. Kordic, Case No. IT-95-14/2-A, Judgment, ¶ 94 (App. Chamber, Dec. 17, 2004)).

Counsel for the plaintiffs have not specifically identified which crime against humanity they are pursuing with this litigation, preferring instead simply to refer the Court to all of their evidence.   The plaintiffs have presented no evidence that any plaintiff was enslaved, deported, or raped.[74]   While one plaintiff has alleged torture, the plaintiffs have submitted no evidence to permit a finding that the torture was part of a widespread, systematic campaign.   None of the plaintiffs is a

---

[73] The ICTY statute lists deportation, not forcible transfer, as a crime against humanity.   See ICTY Statute art. 5. Forcible transfer is included, however, as a crime against humanity under the ICTY statute within the category designated as "other inhumane acts."   See Prosecutor v. Milosevic, IT-02-54-T, Motion for Judgement of Acquittal, ¶ 41 (Trial Chamber, June 16, 2004).

[74] In their Responsive Statement, the plaintiffs explain that they asserted enslavement and rape on behalf of the class only.

murder victim and suing as the estate of the deceased.[75]  On the other hand, each of the individual plaintiffs contends that he or she was forcibly displaced from concession lands.

The plaintiffs might face significant evidentiary challenges at trial in proving that their displacements were part of a widespread and systematic Government campaign directed against civilians during the period October 1998 to March 2003, the dates of Talisman's investment.  The most compelling evidence relates to an earlier period of time.  Some of the plaintiffs' difficulties in this regard will be discussed below in connection with the issue of causation.

There is evidence, however, that Talisman was informed that Government forces forcibly displaced civilian populations to create a buffer zone around oil development sites.  Three examples of such evidence will suffice.  Talisman officials were informed in the summer of 1998 that the Sudanese military removed local inhabitants in proximity to oil work sites.  A 1999 TGNBV report describes the Government's practice of creating a zone around the oil facilities in which no settlement or commerce was allowed.  An 2002 TGNBV security report describes residents being "encouraged" to leave the area around Heglig, purportedly to

---

[75] One plaintiff seeks damages due to the death of her husband.  This plaintiff cannot provide eyewitness testimony of the circumstances under which her husband died.  Talisman disputes in any event her legal right to recover compensation for that loss.

provide security for the oil operations.[76]


4.   <u>War Crimes</u>

The canonical statement of war crimes as "armed conflicts not of an international character" is provided by common article 3 of the Geneva Conventions:

> <u>Persons taking no active part in the hostilities...shall in all circumstances be treated humanely without any adverse distinction founded on race, colour, religion or faith</u>, sex, birth or wealth, or any other similar criteria.  To this end, <u>the following acts are</u> and shall remain <u>prohibited</u> at any time and in any place whatsoever with respect to the above-mentioned persons:
> (a) <u>violence to life and person</u>, in particular murder of all kinds, mutilation, cruel treatment or torture;
> (b) taking of hostages;
> (c) outrages upon personal dignity, in particular humiliating and degrading treatment;
> (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all guarantees which are recognized as indispensable by civilized peoples.

Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Feb. 2, 1956, 6 U.S.T. 3114, 75 U.N.T.S. 31, art. 3 (emphasis supplied); <u>see also</u> <u>Kadic v. Karadzic</u>, 70 F.3d 232, 242-43 (2$^d$ Cir. 1995).[77]

---

[76] The report that made this observation was written by Reading in June 2002.  While there is no evidence about who received this report, some security reports were sent to Talisman officials.

[77] Plaintiffs urge that the second of the two Protocols Additional to the Geneva Convention, commonly referred to as Protocol II, also be considered as a source of war crimes.  <u>See</u> Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International

The plaintiffs contend that the Government's military attacks on civilians in undefended villages constitute war crimes.  Talisman does not disagree, but notes that an individual plaintiff must show that the tort was committed in the course of an armed conflict.  See Kadic, 70 F.3d at 243.

Plaintiffs have introduced evidence from which the plaintiffs may argue that Talisman was informed that Government forces were targeting civilian populations.  Whether the plaintiffs have evidence that each of the plaintiffs was displaced or otherwise injured in a Government attack directed against civilians will be discussed in connection with issues of causation.

5.   Substantial Assistance

Plaintiffs argue that Talisman provided substantial assistance in the commission of each of these crimes through the following acts: 1) upgrading the Heglig and Unity airstrips; 2) designating areas "south of the river" in Block 4 for oil exploration; 3) providing financial assistance to the Government through the payment of royalties; (4) giving general logistical support to the Sudanese military; and (5) various other acts.

The activities which the plaintiffs identify as assisting the Government in committing crimes against humanity and war crimes generally accompany any natural resource development

---

Armed Conflicts, Jun. 8, 1977, 1125 U.N.T.S. 609.  See also Kadic, 70 F.3d at 243 n.8; Prosecutor v. Tadic, IT-94-1, Decision on Interlocutory Appeal on Jurisdiction, ¶ 117 (Oct. 2, 1995).

business or the creation of any industry.[78]  Many countries, including on occasion our own, have encouraged investment by domestic corporations in foreign countries that have abysmal human rights records based on the belief that economic development will bring with it political development, respect for the rule of law and the observance of human rights.

The acts which the plaintiffs identify as acts of substantial assistance have no necessary or obvious criminal component.  For instance, designating acreage for exploration is an essential component of any exploration for and development of natural resources.  Upgrading airstrips is critical to the safe delivery of supplies for and transport of personnel.  Similarly, paying royalties is customary, as is the payment of taxes and duties.[79]  Thus, the plaintiffs' theories of substantial assistance serve essentially as proxies for their contention that Talisman should not have made any investment in the Sudan, knowing as it did that the Government was engaged in the forced eviction of non-Muslim Africans from lands that held promise for the discovery of oil.

---

[78] Canada as a matter of national policy holds out the promise of the reinstatement of support services for Canadian companies engaged in trade with the Sudan as an incentive for the Sudan to resolve its internal disputes peacefully, believing that engagement and economic development of the country is the best route to bringing peace and the rule of law.  See Presbyterian Church, 2005 WL 2082846, at *1, *6 (describing diplomatic note from the Embassy of Canada to the United States Department of State and distinguishing oil exploration from trade).

[79] Any business enterprise in or trade with the Sudan would no doubt have contributed to the Government's coffers.

It may be that this issue is best analyzed as one of intent, and therefore, that it is a purely factual matter that is most appropriately resolved at trial.  Since liability for aiding and abetting will only lie where a jury finds that the defendant engaged in an act that provided substantial assistance to the wrongdoer with both knowledge of the criminal enterprise and <u>intent</u> to further that goal, a plaintiff must be able to show that the business activity, which would otherwise appear to be a normal component of the conduct of a lawful business, was in fact specifically directed to assist another to commit a crime against humanity or a war crime.  This is a demanding burden when otherwise lawful acts are designated as the acts which provide substantial assistance, and there is no direct evidence of improper intent and no direct participation in the criminal act.

The plaintiffs essentially argue that Talisman understood that the Government had cleared and would continue to clear the land of the local population if oil companies were willing to come to the Sudan and explore for oil, and that understanding that to be so, Talisman should not have come.  They have no evidence that Talisman (or TGNBV or GNPOC) participated in any attack against a plaintiff and no direct evidence of Talisman's illicit intent, so they wish to argue that Talisman's knowledge of the Government's record of human rights violations, and its understanding of how the Government would abuse the presence of Talisman, is a sufficient basis from which to infer Talisman's illicit intent when it designated areas for exploration, upgraded

73

airstrips or paid royalties.  Against this background, we turn
now to the factual deficiencies in the plaintiffs' evidence that
Talisman contends require summary judgment in its favor with
respect to each of the acts that the plaintiffs have identified
as Talisman's substantial assistance to the Government's
violations of international law.

     a.   <u>Developing the Unity and Heglig Airstrips</u>

The plaintiffs contend that Talisman substantially assisted
the Government's crimes by upgrading and improving two airstrips,
knowing that the Government would use the improved airstrips to
launch attacks on civilians.  The plaintiffs do not contend that
Talisman either knew of any specific Government attack on
civilians before it occurred or did anything to support or
encourage a specific attack.

There is evidence that the Government used the Heglig and
Unity airstrips to violate international law by targeting and
displacing civilians.[80]  Nine plaintiffs have described being
displaced and/or injured by helicopter and bomber attacks.  At
least some of the plaintiffs are entitled to rely on
circumstantial evidence that the flights that made those attacks
originated from the Heglig and Unity airstrips.  The airstrips
provided a base of operations that was close to some of the

---

[80] Some of the evidence on which the plaintiffs properly
rely to show that Talisman was informed of a problem, becomes
hearsay when the plaintiffs try to use it to prove that the
problem was in fact occurring.  For instance, to the extent that
a TGNBV security report is based on hearsay, it may not be used
to show the occurrence of the incidents described in it.

Government's targets, allowing them to reach a wider range of locations, carry less fuel, and fly more frequent missions. The plaintiffs contend therefore that any improvements and upgrades to the airstrips assisted the Government substantially.

The two airstrips, however, were operated by GNPOC. There is no evidence that Talisman had any role in operating the airstrips, nor is there any evidence that Talisman had any role in upgrading the runways or in any other improvements to the airstrips.[81]

To impose liability on Talisman, plaintiffs rely on a single passage from undated handwritten notes, which they identify as being authored by Capeling,[82] in which the author proposes that the military be encouraged to relocate from Heglig to Unity airstrip so that it could establish "a stronger presence further south with better infrastructure and support." The notes add, "[t]hey need a better base." These notes do not provide the missing link that would allow a jury to find that Talisman upgraded and improved the Unity airstrip, much less that it did so with the knowledge and intention that the Government use the airstrip to launch attacks on civilians.

Assuming that the plaintiffs can show that Capeling is the

---

[81] Decisions to make capital improvements to oil facilities were made through Authorizations For Expenditures (AFE) forms that were circulated to all GNPOC members for approval. The plaintiffs have not pointed to any AFE form addressed to improvements of the airstrips. In any event, TGNBV, and not Talisman, was a member of GNPOC.

[82] The plaintiffs point to no evidence that Capeling is the author.

author of the notes, that would show that the general manager of
TGNBV considered such a proposal.  The plaintiffs have not
pointed to any evidence that TGNBV (a 25% participant in GNPOC)
decided to make the proposal, that it presented the proposal to
GNPOC, or that GNPOC adopted it.  As already described in this
Opinion, there is evidence that the military did move its bombers
and helicopters to Unity airstrip after it was upgraded, but no
evidence that this was due to a request from GNPOC.

     Taken in the light most favorable to plaintiffs, the
evidence shows that the Sudanese military was responsible for the
security of GNPOC personnel and operations in an area torn by
armed conflict, that GNPOC was responsible for the infrastructure
within the concession, and that GNPOC and the Consortium Members
understood both that the military would take advantage of any
infrastructure improvements, including upgraded airstrips, in
planning their operations, and that the military engaged in not
just defensive operations from airstrips, but also offensive
operations.  This is not sufficient to raise a question of fact
as to whether <u>Talisman</u> upgraded the airstrips, much less that it
specifically directed that activity to assist the Government to
engage in offensive military operations against civilians rather
than defensive operations or offensive operations against rebel
forces.

     Although not articulated by the plaintiffs, there is another
argument that they may wish to make at trial.  They may contend
that Talisman is liable for the upgrading of the airstrips

because TGNBV would not have made the suggestion that the
airstrips be upgraded and that the military move to the Unity
airstrip without Talisman approving the decision.[83]   Again,
however, there are simply too many evidentiary gaps to impose
liability on this theory either.   The plaintiffs have not pointed
to evidence that TGNBV made the proposal, much less that it did
so after discussion with Talisman.   The plaintiffs have not even
shown precisely which TGNBV security reports went to Talisman.
As significantly, the documents on which the plaintiffs rely most
heavily in opposing summary judgment, show that on those
occasions on which Talisman did try to act in the Sudan to affect
security matters, its efforts had to be made by going through
GNPOC and that those efforts were often rebuffed.   To give but a
few examples, the Government failed to respond to GNPOC requests,
made at TGNBV's behest, to stop using Heglig for bombing runs in
1999; GNPOC's Mohktar refused to ask the Government to move
flight operations to Rubkona in the spring of 2001; and a TGNBV
report in 2001 addressing the military use of the airstrips noted
that the Government had "strung this along" despite "on occasions
telling us what we want to hear."

     In sum, the plaintiffs have not shown that Talisman took any
steps to upgrade either the Heglig or Unity airstrips or that it
did so with the intent that the Government of the Sudan would use

_____

     [83] As will be discussed later in this Opinion, the 2003
Complaint did not plead an agency theory of liability to hold
Talisman liable for TGNBV's actions, and the attempt to add such
a theory through the 2006 Complaint fails.

the airstrips to launch attacks on civilians.  This theory of aiding and abetting liability fails.

  b. <u>Exploring "South of the River"</u>

  The plaintiffs contend that Talisman "furthered" the conspiracy by designating areas for oil exploration outside Blocks 1 and 2 and "south of the river", knowing that this designation "required" Government security forces to clear the area of non-Muslim, African civilians.  According to the plaintiffs, the essence of the crime was the designation of an area for oil development that was outside the territory already under Government control.  The plaintiffs essentially rely on two pieces of evidence: brief deposition testimony by TGNBV's Capeling and a single April 2001 e-mail with minutes of a brainstorming session among Consortium Members.  Two of the plaintiffs were displaced from the area south of the river following April 2001 by what they identify as Government attacks.

  Plaintiffs have failed to point to any evidence that GNPOC ever adopted a plan to explore "south of the river", or that the Sudanese military engaged in any clearance activity because GNPOC had communicated such an intention to the Government.  In any event, if an area south of the river were designated for exploration, that decision would have been made by GNPOC, not Talisman.  Even as to the preliminary discussions to which the plaintiffs point, they have again failed to connect these preliminary discussions to Talisman.  Capeling was the general manager of TNGBV; the plaintiffs have not even pointed to

78

evidence from which one could infer that Capeling was instructed by Talisman to develop a plan to explore "south of the river."

Because there is no evidence that Talisman had any involvement in a plan or proposal to explore south of the river, it is unsurprising that there is also a complete absence of evidence of Talisman's illicit intent in this regard.  With respect to TGNBV and GNPOC, the evidence reflects a desire to expand exploration activities only if it could be done peacefully, a prospect that some viewed as unlikely.

c.   <u>Financial Assistance to the Government</u>

Plaintiffs contend that Talisman aided and abetted the Government by paying royalties to the Sudanese Government, which the Government used to purchase large amounts of new weaponry that it turned against the plaintiffs.  Plaintiffs principally rely on an expert report submitted by military experts Sherwood Goldberg and Edward O'Connor ("Goldberg Report") to establish the financial link between oil revenues and military expansion.[84] The Goldberg Report asserts that the Government earned $800 million in oil revenue in 2002 and that it came largely from GNPOC's extraction of oil and payment of royalties.  This same data is presented in the report by plaintiffs' expert Johnson, which identifies the source as the Human Rights Watch report <u>Sudan, Oil, and Human Rights</u> ("HRW Report").  The plaintiffs have

_____

[84] Plaintiffs withdrew their designation of Edward O'Connor as an expert at his deposition on March 2, 2006.

not offered the HRW Report as evidence.[85]

Plaintiffs have failed to identify any admissible evidence on the amount or source of royalty payments to the Government, the amount spent by the Government on weapons procurement, or the timing of those expenditures.[86]  While Goldberg may be able to offer his expert opinion on the importance of the financial relationship to the military's effectiveness in the south, his opinion is not evidence of that relationship.

The plaintiffs have evidence from which a jury could find that Talisman believed that the Government used oil revenues to buy armaments, even if Talisman did not have any direct evidence or knowledge of that fact.  It is reasonable to assume that evidence exists, even if the plaintiffs have not marshaled it for this motion, that Talisman's revenue stream from its investment in the Sudan was reduced because of royalty payments made by GNPOC or TGNBV, and that Talisman's audit procedures accounted

---

[85] Talisman has submitted a two page excerpt from the HRW Report to support its motion to exclude the Goldberg Report.

[86] Plaintiffs present a few documents that reflect different individuals' views about the connection between oil revenues and military spending, but do not fill the evidentiary gap with competent evidence.  An email from a Talisman employee seconded to GNPOC, sent to his sisters, speculates that "oil will just buy more military power to use against the south" and "[n]obody can tell me that this oil is not buying more military power."  A 2001 Security Assessment by TGNBV security officer Dingley describes a possible increase in military spending by the Government.
A TGNBV security report from the summer of 2002 states that "the nature of the conflict has changed substantially in the last 3 and half years.  What was an essentially low-tech bush war has changed at least for the [Government].  The goose is now far stronger and has a distinct technical superiority over the rebels."

for those reductions.  It is also reasonable to assume, even if
the plaintiffs have not succeeded in gathering admissible
evidence to show when it occurred, that the Government spent
money to buy helicopters and cargo planes, crudely convert the
latter to bombers, and buy munitions.  Nonetheless, even if the
plaintiffs had pointed to evidence regarding each link in this
chain of evidence, the issue would remain whether they had
identified evidence sufficient to support a finding that when
Talisman (or TGNBV or GNPOC) paid royalties, it "specifically
directed" those payments to the Government's procurement of
weaponry to target civilians and displace them.

Knowledge that such attacks had occurred and would likely
occur again simply does not provide circumstantial evidence of an
intent to assist in those attacks by the payment of royalties.
The plaintiffs have pointed to no evidence that Talisman urged
that such attacks be made.  Quite to the contrary, the evidence
to which the plaintiffs have directed the Court's attention on
this motion includes several examples of Talisman speaking either
with the head of GNPOC security or the Government to discourage
such attacks and advocate that oil revenues be spent for
development.  Moreover, the Government was responsible for the
security of GNPOC oil operations in the midst of a civil war.
Defensive military actions, and even offensive campaigns not
directed at civilians, would not be a violation of international
law.  The connection between the payment of royalties and the
Government attacks on civilians is simply too indirect to permit

81

the payment of royalties itself to serve as circumstantial
evidence of an intent to assist in the Government's commission of
war crimes and crimes against humanity.

    d.    Acts of Assistance to the Military

    Plaintiffs contend that "Talisman, along with its GNPOC
partners" assisted the Sudanese military by supplying the
military with fuel and accommodations and building roads, among
other things.[87]  In particular, the plaintiffs argue that the
construction of all-weather roads was significant assistance.
The conflict in the Sudan was shaped by the changing seasons.
The Government enjoyed a significant advantage because it had
better vehicles and its forces were more mobile.

    The decision to build the all-weather roads, however, was
made by GNPOC.  The plaintiffs have pointed to no evidence that
Talisman shaped that decision in any way.  The plaintiffs have
also pointed to no evidence that Talisman provided any
accommodations or fuel to the military.  Again, Talisman's
limited presence on the ground in the Sudan frustrates any effort
by the plaintiffs to show that Talisman substantially aided the
Sudanese military by providing logistical support, much less that
it specifically directed any assistance to the Government's
violation of international law.

    e.    Remaining Examples of Assistance

    The remaining theories of substantial assistance may be

---

    [87] The plaintiffs' brief refers specifically to only these
three forms of assistance.

quickly described.[88]  Plaintiffs allege that Talisman assisted
the Government by using its community development program as a
cover for gathering military intelligence.  This allegation is
based on accusations by Taylor, who is deceased, and is
inadmissible hearsay.  Plaintiffs' other evidence comes from Yak
and Chief Patai and is only speculation of a possible connection
between two events: a visit by a community development team from
an oil company and an attack on a village two days later.

Finally, plaintiffs contend that Talisman "ratified" the
human rights violations of the Government by publicly denying
knowledge of those violations.  Talisman's public comments do not
constitute substantial assistance in acts of genocide,
displacement or the targeting of civilians, and do not raise a
question of fact as to whether the statements themselves were
specifically directed to assist the Government in committing
those acts.


6.  Causation

Beyond the failure to show Talisman's substantial assistance
in the Government's violation of human rights, there remain
issues concerning causation.  Talisman argues that only a few of
the plaintiffs injuries can be causally linked to the violations

---

[88] Plaintiffs also claim that material assistance was
provided to militia groups "by the oil companies."  Plaintiffs
only admissible evidence linking Talisman to the militia groups
is testimony by Gatduel about a meeting with someone called Alnof
about an attack on Nimne.  There is no evidence of who Alnof is
or for whom he worked.

of international law in which it is alleged to have participated. Because southern Sudan was a war-torn area, with violence ongoing for decades among many competing factions, every civilian injury cannot be attributed to attacks directed at civilians. Similarly, not every attack is necessarily an attack by the military or militia aligned with the Government.  Thus, to recover in this lawsuit, a plaintiff must show that he or she was displaced or injured in an attack by Government forces and that the attack either targeted civilians or was undertaken to displace civilians.[89]

Because Talisman is entitled to summary judgment on all of the claims that plaintiffs have brought against it, it is unnecessary to resolve this argument.  A brief review of the plaintiffs' evidence however, suggests that only three plaintiffs have shown that they were displaced by Government attacks to which GNPOC arguably provided assistance: Yol, Mut and Chief Tut.

With respect to the five plaintiffs who were displaced from Blocks 1, 2, and 4 in the period after Talisman acquired Arakis, only these three report that the displacement occurred because of an aerial attack.  As to the remainder, they have not identified any basis to infer that the attacks were by Government forces, or forces aligned with the Government, or that the displacement occurred because of an attack that targeted civilians.

---

[89] Moreover, the plaintiffs acknowledge that not all Government attacks were even connected to the oil industry. According to the plaintiffs' experts, the Government's aggression in the south was also part of a long-term plan of "islamization" and "jihad."

The plaintiffs have failed to present sufficient evidence to find Talisman (or TGNBV or GNPOC) liable for any displacement from Government attacks on civilians in Block 5A, the block in the oil concession area under the management of Lundin.  Only five of the eight plaintiffs who were displaced from Block 5A were displaced by aerial bombardments.[90]  Even those attacks cannot be linked to GNPOC, or through GNPOC to Talisman, though.

There were three airstrips in the GNPOC concession: Heglig in Block 2 and Unity and Rubkona in Block 1.  GNPOC managed Heglig and Unity; Rubkona was operated by the Government and Lundin and was also the location of a military base.  Rubkona lies at the southeast corner of Block 1, and is the airstrip that is both the furthest south and east.

During the period of Talisman's investment, none of the plaintiffs was displaced or injured in an aerial attack in Block 2.  Yol was displaced by an aerial attack in the north of Block 1, to which Heglig was the closest airstrip and Rubkona the most distant.  Chief Tut and Mut were displaced and injured in attacks at or south of the Bahr el Arab river in Block 4.  Rubkona is somewhat closer than the Unity airstrip to each of these sites, and the Heglig strip is much further away.  The Rubkona airstrip is clearly closer to the site of each attack in Block 5A than either the Heglig or Unity airstrip.

---

[90] As for the remaining three plaintiffs displaced from Block 5A, they have not always identified evidence to show that it was the Government who attacked the settlement, or to show that the attack was aimed at civilians.

The plaintiffs have no admissible evidence to identify the airstrip from which any Government aircraft flew on a particular mission.  To the extent that the plaintiffs rely on the inference that helicopter gunship and bomber attacks in Blocks 1, 2 and 4 originated from either Unity or Heglig airstrips, which were under GNPOC's control, rather than the Rubkona airstrip (which was under the Government's control and next to the Lundin concession area) because Unity and Heglig were closer to the area attacked (or almost as close to the area), then they have the burden to show that attacks in Block 5A were or were at least likely to have been launched from Unity or Heglig instead of the airstrip that was the closest to Block 5A.  They have offered no evidence to support such an inference, and they may not shift their burden in this regard by arguing that Talisman has not shown that the attacks did not originate from Rubkona.[91]

---

[91] The plaintiffs argue that Talisman can be linked to the conduct of Lundin in Block 5A, and therefore to attacks in Block 5A, because of a "joint seismic program" between Lundin and Talisman and because oil from Block 5A was transported in the Pipeline.  There is no evidence of a "joint seismic program" nor is there any evidence that oil from Block 5A was transported through the Pipeline.  Further, Capeling has testified that no oil from Block 5A, or any other non-GNPOC concession, was ever carried in the Pipeline during the time of Talisman's investment in the Sudan.

The plaintiffs also make the following statement in their Responsive Statement: "Lundin's investment in [B]lock 5[A] made economic sense only because of the pipeline which ran from Talisman's concession to the Port Sudan refinery.  Conversely, the pipeline made economic sense only if it could also accommodate oil from Block 5[A]."  The identified support for this statement is deposition testimony from a human rights researcher that Lundin had "mentioned to Talisman many times that it wanted to hook up to Talisman's pipeline in Block 1."  This is inadmissible hearsay, and does not in any event prove the proposition asserted in the Responsive Statement.

Finally, the claims brought by the two institutional plaintiffs must also be dismissed.  Plaintiff NCDS is not an alien and may not bring suit under the ATS.  Plaintiff Presbyterian Church has only presented evidence of a single attack that may be linked to the Government, the destruction of a church in Leer by a bomber.  That attack occurred in Block 5A, and there is no evidence to support an inference that the attack originated from the Heglig or Unity airstrips.[92]

In sum, Talisman is entitled to summary judgment on the claims presented in the 2003 Complaint.  The plaintiffs have abandoned their claim that Talisman is directly liable for violating international law.  The claim that Talisman conspired with the Government of Sudan fails because the plaintiffs' conspiracy claim relates to the forcible transfer of a civilian population, and international law does not recognize the crime of conspiracy for that conduct.  The remaining claim, that Talisman aided and abetted the Government, fails for several reasons, including the plaintiffs' failure to present evidence that would raise a question of fact as to whether Talisman performed any act that assisted the Government in its violations of international law.

---

[92] In their Responsive Statement, plaintiffs cite to evidence from the deposition of James Abelee about the Government "tactics" of tearing down churches, but have not included the relevant pages of Abelee's deposition in their evidence.

II.  Motion to Amend Complaint

    The plaintiffs have moved to amend their complaint.  The
2003 Complaint pleads a single claim that the defendant Talisman
violated or aided and abetted its co-defendant the Republic of
the Sudan to violate the law of nations.  It pleaded that
Talisman was sued for its own actions, as a successor to Arakis
and as a member of GNPOC.  It alleges in the body of the pleading
that Talisman and the Government conspired with each other to
violate the law of nations.

    On the eve of summary judgment practice, the plaintiffs
moved to amend their pleading and to file a Third Amended
Complaint, the 2006 Complaint.  When stripped to its essentials,
this amendment seeks to hold Talisman liable for the actions of
GNPOC.  The 2006 Complaint identifies alter ego, agency, and
joint venture liability as additional theories of liability.  The
plaintiffs advance these new theories to hold Talisman liable for
the acts of first TGNBV, and through TGNBV, for the acts of
GNPOC.  The 2006 Complaint asserts that Talisman is liable as
TGNBV's alter ego under a veil piercing theory of liability, or
because TGNBV acted as Talisman's agent.[93]  In the event that
Talisman may be held liable for TGNBV's acts, the joint venture
theory seeks in turn to hold TGNBV liable for activities of GNPOC
and the Consortium Partners.  In contrast to the 2003 Complaint,

------

    [93] The plaintiffs' brief in opposition to summary judgment
described not only TGNBV but also GNPOC as Talisman's agent.  The
2006 Complaint asserts an agency theory of liability as to TGNBV
alone.

which focused on the cooperation between Talisman and the
Government, the 2006 Complaint asserts that Talisman also acted
with GNPOC and TGNBV either by aiding and abetting GNPOC in
ethnic cleansing, or conspiring with GNPOC, the Consortium
Partners and TGNBV.

Through the summary judgment motion practice, it has become
clear that the plaintiffs have abandoned any claim that Talisman
itself violated the law of nations and, as just explained, they
have been unable to identify evidence that Talisman aided or
conspired with the Government in the latter's violation of the
law of nations.  Thus, the plaintiffs now depend on the theories
of indirect liability that they advanced for the first time in
the 2006 Complaint to hold Talisman liable for GNPOC's
activities.

Talisman has opposed the amendment.  The plaintiffs' motion
to amend their complaint is governed by Rule 16, Fed R. Civ. P.,
which requires a showing of good cause.[94]  See In re Wireless
Telephone Services Antitrust Litig., 02 Civ. 2637 (DLC), 2004 WL
2244502, at *5 (S.D.N.Y. Oct. 6, 2004).  To show good cause a
movant must demonstrate that it has been diligent.  See

_____

[94] The plaintiffs' motion to amend was brought under Rule
15(a), Fed. R. Civ. P., despite the existence of a scheduling
order which required any amended pleading to be served by August
15, 2003.  Because of that scheduling order, the motion is
evaluated under Rule 16, Fed. R. Civ. P.  See Parker v. Columbia
Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2003) (holding that
district court did not abuse its discretion in denying leave to
amend after deadline set in scheduling order where moving party
failed to establish good cause).

Grochowski v. Phoenix Const., 318 F.3d 80, 86 (2d Cir. 2003).

The plaintiffs have not shown good cause.  They have not even attempted to show their diligence, nor could they.  The motion to amend comes over four and a half years after the filing of the lawsuit, over two and a half years after the deadline for amendment, more than two years after Talisman brought a motion attacking the previous theory of secondary liability (aiding and abetting liability) pleaded in the 2003 Complaint, over a year after the close of fact discovery, and virtually on the eve of the filing of the summary judgment motion.  While the plaintiffs defend their filing as simply a clarification of theories of secondary liability that were set forth in the 2003 Complaint, they are absolutely wrong.  The proposed amendment dramatically alters the plaintiffs' theories of liability and the focus of the entire case.[95]

It could even be said that the plaintiffs acted in bad faith in waiting until the eve of summary judgment practice to file the motion to amend.[96]  The choice of the filing date left the defendant with sixteen days before it was required to file its

---

[95] Plaintiffs point out that Judge Schwartz observed in a footnote in his March 19, 2003 Opinion, that Talisman may be held liable for GNPOC's acts under a joint venture theory of liability.  Presbyterian Church, 244 F. Supp. 2d at 352 n.50. Plaintiffs' thereafter amended their complaint -- on August 18, 2003 -- and did not plead a joint venture theory.

[96] The motion to amend was filed on April 12, 2006, making it impossible for it to be briefed and decided before April 28, the date on which summary judgment motions were due.

motion for summary judgment.[97]  Talisman chose to address some of the new theories of secondary liability in its summary judgment motion and reserved its right to address all of them in detail in later motion practice in the event the motion to amend were granted.

The plaintiffs have not made any showing that the newly advanced theories have merit or that they could withstand a motion for summary judgment.[98]  Indeed, it does not appear that the plaintiffs are adequately prepared even at this late stage to assert their new theories of secondary liability.  For example, the 2006 Complaint asserts that the corporate structures of five separate corporations should be disregarded in order to impose liability on Talisman for the actions taken by GNPOC.  This demands a careful analysis of choice of law and foreign law issues, and the plaintiffs do not articulate a coherent analysis of either in response to Talisman's summary judgment motion. Quite to the contrary, the plaintiffs have not presented any affidavits of foreign law and simply ask the Court to disregard settled choice of law principles and apply domestic law.

---

[97] The trial date of January 8, 2007 was set in September 2005, and as the parties were advised at that time, is firm.  As a consequence, the schedule for summary judgment motions was chosen to allow time for decision and thereafter time for the parties' preparation of pre-trial submissions.

[98] The plaintiffs assert that the amendment is not futile because it could withstand a motion to dismiss for failure to state a claim.  It is much too late in the day for the application of that standard.  With the preparation of the Pretrial Order as the next step in the litigation, the newly advanced theories must be able to survive summary judgment practice.

Similarly, the plaintiffs are unable to point to record evidence
to support their arguments that, as a factual matter, Talisman so
misused the corporate form that the corporate veil should be
pierced.

In opposition to the motion to amend and in support of
summary judgment, Talisman argues that it cannot be held liable
for TGNBV's conduct because the plaintiffs have not shown that
the corporate form of TGNBV and the three intermediate companies
between it and Talisman should be disregarded under the laws of
Netherlands and England, the states of incorporation for TGNBV
and the intermediate companies.  Talisman also argues that TGNBV
cannot be held liable for GNPOC's conduct or the conduct of the
Consortium Members under the Law of Mauritius, the place of
GNPOC's incorporation.  For the reasons described below, Talisman
is correct.  While it would be entirely appropriate to deny the
plaintiffs' motion to amend without engaging with the merits of
the proposed amendment, because of the significance of this
litigation to each of the parties, and the fact that the
plaintiffs' claims are otherwise subject to dismissal on summary
judgment, the remainder of this Opinion will address at least
some of the theories of secondary liability that the plaintiffs
introduce in the 2006 Complaint.  As this discussion
demonstrates, the plaintiffs' motion to amend should be denied
not just because of their utter failure to show good cause, but
also because the amendment appears to be futile.

A.   Choice of Law Rule

     In order to locate the law which would govern a
determination of whether Talisman may be held accountable for the
actions of TGNBV and GNPOC, it is necessary to select the choice
of law standard which will be applied.   The plaintiffs' claims
are all brought under a federal jurisdictional statute, the ATS.
Sosa, 542 U.S. at 724.   The plaintiffs argue that federal choice
of law rules should be applied because of the unique federal
interests that are implicated by the ATS.   Talisman argues that
the choice of law rules of New York, the forum state, should be
applied.

     The Second Circuit has "never definitively resolved" the
question of choice of law in ATS cases, Wiwa v. Royal Dutch
Petroleum Co., 226 F.3d 88, 105 n.12 (2d Cir. 2000), but did
address the issue in Filartiga v. Pena-Irala, 630 F.2d 876 (2d
Cir. 1980).   Filartiga distinguished the inquiry into subject
matter jurisdiction, which is provided by the ATS, from the
inquiry into choice of law, which it described as "a much broader
one, primarily concerned with fairness" and thus one that looks
"to wholly different considerations."   Id. at 889.   While
Filartiga did not explain what those wholly different
considerations were, the decision cited Lauritzen v. Larsen, 345
U.S. 571 (1954), which had articulated choice-of-law principles
for a Jones Act case in which an injured Danish seaman working on
a Danish ship filed suit in New York to recover for injuries
sustained in Cuba.   Id. at 573.   Recognizing the duty "to respect

93

the subjects and the rights of all other sovereign powers outside
its own territory," id. at 578 (citation omitted), the Court
weighed the factors connected to the shipping transaction and the
national interests "served by the assertion of authority," id. at
582, such as, the place of the wrongful act, the law of the flag,
the domicile of the injured seaman, the citizenship of the
shipowner, and place of the contract, id. at 583-88, to conclude
that Danish law supplied the substantive law and forbade
recovery.  Id. at 592.  "The purpose of a conflict-of-laws
doctrine is to assure that a case will be treated in the same way
under the appropriate law regardless of the fortuitous
circumstances which often determine the forum."  Id. at 591.

Since the Second Circuit spoke in Filartiga, the Supreme
Court has significantly curtailed the application of federal
common law, and therefore the use of federal choice of law rules,
which "are a species of federal common law."  In re Gaston &
Snow, 243 F.3d 599, 606 (2d Cir. 2001).  Under the current
framework, "[t]he ability of the federal courts to create federal
common law and displace state created rules is severely limited."
Id.[99]  In order to justify the decision to fashion rules of

---

[99] The plaintiffs point out that in Corporacion Venezolana
de Fomento v. Vintero Sales Corp., 629 F.2d 786 (2d Cir. 1980),
the Second Circuit applied federal choice of law rules in a
federal question case, with the observation that the "use of
federal common law in specialized areas where jurisdiction is not
based on diversity has been sanctioned by the Supreme Court since
the day Erie was decided."  Id. at 795.  A more recent Second
Circuit decision, however, observed that Corporacion was decided
"without the benefit of...federal decisions which limited our
power to create federal common law."  Pescatore v. Pan American
World Airways, Inc., 97 F.3d 1, 12 (2d Cir. 1996).

federal common law the "guiding principle is that a significant conflict between some federal policy or interest and use of state law must first be specifically shown." Atherton v. FDIC, 519 U.S. 213, 218 (1997) (citation omitted). A generalized allegation of conflict is insufficient to justify the displacement of state law. See Woodward Governor Co. v. Curtiss Wright Flight Systems, Inc., 164 F.3d 123, 127 (2d Cir. 1999) ("[A]n actual, significant conflict between a federal interest and state law must be specifically shown, and not generally alleged." (citation omitted)).

The plaintiffs have not pointed to any conflict that would justify the displacement of the law of the forum state. Rather, they simply contend that federal choice of law principles should be applied and then proceed to identify just two factors to guide the selection of substantive law: the place of injury and domicile of the parties. They then propose that both those factors be ignored. Since Sudan is not an adequate forum for this lawsuit, see Presbyterian Church, 244 F. Supp. 2d. at 335-36, they assert without further discussion that its substantive law should be disregarded too. Since Talisman does business in the United States through subsidiaries, see Presbyterian Church, 2004 WL 1920978, at *2, they assert it is appropriate to ignore Canadian law. As a result of this truncated analysis, the plaintiffs propose that federal common law provide not just the choice of law rule but also the substantive law for issues such as piercing the corporate veil and agency. Plaintiffs emphasize

that there is a significant policy interest "implicit in our federal statutory law in providing a forum for adjudication of claims of violations of the law of nations." <u>Wiwa</u>, 226 F.3d at 100.[100]

Pointing to a federal policy interest in providing a forum, however, is not a substitute for the identification of a conflict requiring displacement of state law. <u>See Empire Healthchoice Assur., Inc. v. McVeigh</u>, 126 S.Ct. 2121, 2132 (2006) ("an area of uniquely federal interest establishes a necessary, not a sufficient, condition for the displacement of state law." (citation omitted)).  Because the plaintiffs fail to identify any such conflict, New York's choice of law rules will be applied.[101] <u>Id.</u> at 2132-33.

"[U]nder New York choice of law principles, the law of the state of incorporation determines when the corporate form will be

---

[100] This federal interest has been acknowledged in this litigation.  <u>See Presbyterian Church of the Sudan v. Talisman Energy, Inc.</u>, 2005 WL 2082846, at *7.

[101] It is unlikely that any conflict could be identified. Since choice of law rules seek to insure that a case will be resolved under the same rules of conduct whatever the forum, and that rights of foreign sovereigns will be respected, <u>see Lauritzen</u>, 345 U.S. at 578, 591, it is difficult to believe that federal choice of law rules would not require the application of the law of the state of incorporation to a determination of whether to ignore the corporate form.  Plaintiffs' only argument in support of an actual conflict is a footnote that asserts that if New York choice of law rules would result in Dutch law governing questions of corporate form in this action, then the application of New York law reveals a significant conflict with a federal policy.  This result-driven logic is no substitute for the identification of the federal choice of law rule or of a federal policy that is in conflict with the application of New York's choice of law rules.

disregarded and liability will be imposed on shareholders."
Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)
(citation omitted).  The discussion that follows will work from
the ground up, addressing first GNPOC, then TGNBV, and finally
the intermediate Talisman subsidiaries.  The law regarding the
creation of a joint venture will be described in connection with
Talisman's liability for the conduct of GNPOC.  Finally,
Talisman's liability on the theory that TGNBV was acting as its
agent will be discussed in connection with TGNBV.


B.    GNPOC

     The plaintiffs seek to hold Talisman liable for GNPOC's
conduct or the conduct of the Consortium Partners who formed
GNPOC on the theory that Talisman is liable, through TGNBV, as a
participant in a joint venture.  GNPOC is a corporation.  The
plaintiffs have not shown either that it is appropriate to pierce
the corporate veil or to treat it as a joint venture.


1.  Veil Piercing

     GNPOC is incorporated under the laws of Mauritius.  GNPOC's
articles of incorporation establish that Consortium Members,
including TGNBV, own GNPOC as shareholders.  As a general rule,
under the law of Mauritius, a plaintiff cannot recover damages
from a shareholder for wrongs committed by the company.
Mauritian law does allow for the corporate veil to be pierced,
however, when it can be proved that a company conducts business

97

with the intent to defraud creditors or as a mere façade.   There
are no Mauritian court decisions that provide guidance on what it
means to operate as a façade.   When faced with novel questions of
corporate law, Mauritian courts turn to English case law for
guidance.   English courts find that a corporation is a façade
when a subsidiary is established as a mere device for the purpose
of evading existing obligations to other parties.

Plaintiffs have not presented evidence that the Consortium
Members created GNPOC to shield themselves from existing
liabilities or that GNPOC conducted its business with the intent
to defraud creditors.   Consequently, GNPOC's corporate form will
be observed.


2.   <u>Joint Venture Liability</u>

Not only have plaintiffs failed to show that GNPOC's
corporate veil should be pierced, they have also failed to show
that GNPOC or the activities of the Consortium Partners would
otherwise qualify as a joint venture.[102]   The parties dispute

---

[102] The plaintiffs include the Government as one of those
joint venturers through its ownership of Sudapet, and thereby
seek to hold Talisman liable for the Government's conduct as a
joint venturer.   In order for the Government to be viewed as one
of the joint venturers, Sudapet's corporate form would have to be
disregarded.   The plaintiffs have failed to provide evidence of
the law of Sudan to show what standard should be applied to
pierce the corporate veil, or to point to any evidence that
describes the relationship of the Government and Sudapet, much
less evidence that supports their contention that Sudapet's
corporate form should be disregarded.   <u>See</u> <u>First Nat. City Bank</u>
<u>v. Banco Para El Comercio Exterior De Cuba</u>, 462 U.S. 611, 626-27
(1983) (noting that "government instrumentalities established as
juridical entities distinct and independent from their sovereign
should normally be treated as such").

which law should be applied to analyze joint venture liability.
Plaintiffs would apply New York law, while defendant argues that
the law of Mauritius governs.  The first step in deciding a
potential choice of law issue under New York law is to determine
whether there is an actual conflict between the laws of the two
jurisdictions involved.  Globalnet, 449 F.3d at 382.  The
plaintiffs have failed, however, to present evidence to create an
issue of fact that a joint venture exists under the laws of
either jurisdiction.  As a consequence, there is no need to
resolve the choice of law dispute.  See Compagnie Noga
D'Importation et D'Exportation, S.A. v. Russian Federation, 361
F.3d 676, 685 (2d Cir. 2004) ("In any event, because we conclude
that the answer to this question is the same regardless which of
the bodies of law advocated by the parties is applied here, we
need not cut the Gordian choice-of-law knot presented to us by
the parties.").

Under Mauritian law a joint venture is an arrangement
between two or more persons to pool resources in equal shares for
a specific purpose and for the benefit of a third party.  Two
forms of joint ventures are recognized: societe de fait, which is
not registered or incorporated, and societe civil, which must be
registered with the Mauritian Registar of Companies.  In order to
prove that a corporation is a defacto societe de fait, it is
necessary to show that all three elements of a joint venture
exist: 1) ownership in equal shares 2) of an entity formed for a
specific purpose and 3) operating for the benefit of a third

party.   A third party seeking to bringing suit against a societe de fait can only do so by bringing suit against all its members.

Under New York law, a joint venture is formed when:

(a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses.

SCS Comm'ns, Inc. v. Herrick Co., Inc., 360 F.3d 329, 341 (2d Cir. 2004).  All of the elements must be present before joint venture liability may be imposed.  Itel Containers Int'l. Corp. v. Atlanttrafik Express Service Ltd., 909 F.2d 698, 701 (2d Cir. 1990).  "A joint venture and a corporation are mutually exclusive ways of doing business."  Id. at 702.  "Though business associates may be treated as partners vis-a-vis one another even when they operate through a corporation, the corporate form is to be respected in dealings with third parties."  Id.

The plaintiffs have not presented evidence that would support the imposition of liability on TGNBV (and ultimately the plaintiffs contend on Talisman) as a joint venturer under Mauritian law.  None of the agreements among the Consortium Members provides for participation in equal shares or is designed for the benefit of any third party.

Since GNPOC is organized as a corporation, New York law requires its corporate form to be respected and prevents suit by third parties under a joint venture theory.  In arguing that the Consortium Members were joint venturers under New York law, the

100

plaintiffs ignore this law (even though they refer to Itel, 909
F.2d at 702, which states that principle clearly) and rely
primarily on the agreements the Consortium Members used to set up
their operations in Sudan, specifically the Interim Ageeement,
Consortium Agreement, JOCSA, COPA, EPSA, Surface Agreement, JOA,
and JCOA.  None of these agreements, however, evidences an intent
to create a joint venture.

The Interim Agreement contains a clause that states that the
parties do not intend the Interim Agreement to create or
constitute a partnership or joint venture ("No Partnership
Clause").  The Consortium Agreement states that the Interim
Agreement would "continue in full force and effect" except to the
extent it was amended by the Consortium Agreement and other
agreements and documents signed on March 1.  Nothing in the
Consortium Agreement amends the No Partnership Clause.

The JCOSA established GNPOC as a "private limited company
with its members' liability limited by shares."  The JOCSA makes
clear that the parties intend to establish a private limited
liability company and not a joint venture.  The EPSA, COPA and
the Surface Agreement are agreements between the Government and
the Consortium Members and do not contain language that suggests
an intention to enter into a joint venture.

The JOA and JCOA are agreements entered into by the
Consortium Members detailing their respective obligations under

101

their agreements with the Government of Sudan.[103]  The JOA covers

oil exploration, production, and development in Blocks 1, 2 and

4.[104]  The JCOA covers the construction and operation of the

Pipeline from Blocks 1, 2 and 4 to the Red Sea in northern Sudan.

The JOA includes a section entitled "Nature of Relationship of

Parties" which states that:

> The rights, duties, obligations and liabilities of the
> Parties under this Agreement shall be several and
> individual, not joint or collective, it being the
> express intention of the Parties that their ownership
> of the respective Participating Interests shall be as
> tenants in common, and this Agreement shall not be
> deemed or construed to create a partnership,
> association or trust, or as authorising [sic] any Party
> to act as an agent, servant or employee for any other
> Party for any purpose whatsoever except as explicitly
> set forth herein.

(Emphasis supplied.)  The JCOA contains a similar section, also

entitled "Nature of the Relationship of the Parties" which

states:

> The rights, duties and obligations and liabilities as
> between the Parties under this Agreement shall be
> several and individual, not joint or collective, it
> being the express intention of the Parties that their
> ownership of the respective Ownership Interests shall
> be as tenants in common, and this Agreement shall not
> be deemed or construed to create a partnership,
> association or trust, or as authorizing any Party to
> act as an agent, servant or employee for any other
> Party for any purpose whatsoever except as explicitly
> set forth herein.

---

[103] Under both agreements the duties of the Consortium
Members under their agreements with the Government were to be
performed by GNPOC as the "Joint Operating Company" and
"Operator".

[104] The oil operations to be conducted in Blocks 1, 2 and 4
were governed by the Exploration and Production Sharing Agreement
("EPSA"), that the Consortium Members had entered into with the
Government on March 1, 1997.

(Emphasis supplied.)  The JOA and JCOA, therefore, explicitly disavow the creation of any joint duties, rights or obligations.

The plaintiffs also point to the deposition testimony of Charles Selby ("Selby"), an officer and legal counsel to SPC, one of the original Consortium Members whose interests were eventually acquired by Talisman.  At his deposition Selby testified that when the Consortium was being formed the relationship of the Consortium Members was described as one of partners or joint venturers and that, in his view, it was fair to characterize the formation of GNPOC as a joint venture.[105]  Selby also testified, however, that during the early stages of the formation of the Consortium, the legal relationship of the parties had yet to be defined.

The fact that Consortium Members may have viewed their relationship as a joint venture or described it informally as such is insufficient to create an issue of fact on joint venture liability.  In order to create a joint venture under New York law the parties must enter into an agreement that evidences the intent to establish a joint venture.  The plaintiffs have failed to point to any language in any of the agreements executed by the Consortium Members to support a finding of that intent.  Because the plaintiffs have not created an issue of fact on one of the

---

[105] Plaintiffs also point to a document from February 27, 1997, that seems to be from Arakis, describing the formation of the Consortium.  The document concludes that "the partners to this Sudan petroleum joint venture project can now look ahead to a long and prosperous relationship as developers of one of the last great oil frontiers in the world today."  (Emphasis supplied.)

103

elements necessary to establish a joint venture, the plaintiffs are not entitled to disregard GNPOC's corporate form.

C.   TGNBV and Goal Olie

The plaintiffs seek to hold Talisman liable for the acts of TGNBV either through piercing its corporate veil or under an agency theory.[106]   TGNBV and its parent Goal Olie are incorporated under the laws of The Netherlands.

1.   <u>Piercing the Veil</u>

Under Dutch law, the corporate veil may only be pierced to hold the shareholders of a company liable for claims against the company in limited circumstances which relate to insolvency and are not relevant to this litigation.  Dutch law allows a parent company to be held liable for the misconduct of a subsidiary where the parent company has ignored the separate legal status of the subsidiary under the doctrine of equation.  Where a plaintiff attempts to hold a parent company liable for the conduct of an indirect subsidiary, Dutch law requires a plaintiff to pierce the corporate veil of each intermediate company before it may reach the parent company.

The doctrine of equation requires a showing that the

_____

[106] When this action was filed, TGNBV had net assets of over $400 million and net income of over $90 million.  For whatever reason, the plaintiffs chose not to sue TGNBV.

corporate form has been abused to avoid a legal obligation.[107]    In the only case where the Dutch Supreme Court has upheld a judgment of liability through the application of the doctrine of equation to two companies, the sole shareholder of one company set up a second company to avoid a third-party attachment that had been filed against him personally.  That court has declined to impose liability where the sole basis for application of the doctrine of equation is the substantial overlap between a parent and its subsidiary, including the facts that they share the same board and conduct the same business activities, and that the parent controls the subsidiary's activities.

The plaintiffs have presented evidence that shows that Talisman closely monitored TGNBV and Goal Olie, that there was an overlap in the membership of the boards, and that some of the board members of both companies were Talisman officials.  Viewing that evidence in the light most favorable to the plaintiffs, plaintiffs have still failed to create an issue of material fact that the doctrine of equation should be applied and that the corporate veil that separates TGNBV and Goal Olie from each other and ultimately from Talisman should be pierced.  The plaintiffs have not shown any abuse of the corporate form.

---

[107] Dutch law bears a remarkable similarity to the law of New York, which requires a showing both that the corporate form has been disregarded and that a fraud or other wrong was committed through the abuse of the corporate form.  See In re Vebeliunas, 332 F.3d 85, 91-92 (2d Cir. 2003).

2.   <u>Agency Liability</u>

        The plaintiffs also contend in the 2006 Complaint that
Talisman can be held vicariously liable for any tort committed by
TGNBV because TGNBV acted in the Sudan as Talisman's agent.   The
plaintiffs' truncated discussion of the legal theory relies
exclusively on citation to <u>Bowoto v. Chevron Texaco Corp.</u>, 312 F.
Supp. 2d. 1229 (N.D. Cal. 2004), an ATS decision which denied
summary judgment and permitted the plaintiffs to proceed to trial
on an actual agency theory but not an alter ego theory of
liability.   <u>Id.</u> at 1246-47.   The plaintiffs seek to apply New
York or federal common law principles of agency law, observing
that they are identical.[108]   Conceding that agency principles can
be used to find personal jurisdiction over a parent corporation
based on a subsidiary's presence, <u>see</u> <u>Kohler</u>, 101 F.3d 863, 865
(2d Cir. 1996), Talisman argues that a plaintiff must pierce the
corporate veil to establish liability of the parent for a
subsidiary's acts and cannot substitute an agency theory of
liability.

        Plaintiffs have failed to address the choice of law analysis
that should guide the selection of the substantive law of agency
that applies to Talisman's relationship with TGNBV.   This failure

---

        [108] Under federal law, an agency relationship "depends on the
existence of three elements: (1) the manifestation by the
principal that the agent shall act for him; (2) the agent's
acceptance of the undertaking; <u>and</u> (3) the understanding of the
parties that the principal is to be in control of the
undertaking."   <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 522 (2d
Cir. 2006) (citation omitted).

is particularly problematic because resolving the choice of law question under New York law would require, at a minimum, evidence of the law of two foreign jurisdictions.  "[T]he relevant analytical approach to choice of law in tort actions in New York is the interest analysis." GlobalNet, 449 F.3d at 384 (citation omitted).  Interest analysis seeks to assess "which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue." Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. S.E. Schreiber, 407 F.3d 34, 50 (2d Cir. 2005).  Where the choice of law concerns a loss allocation rule that "prohibits, assigns or limits liability after a tort occurs", id. (citation omitted), the interest analysis is conducted with reference to the principles set forth in Neumeier v. Kuehner, 31 N.Y.2d 121 (N.Y. 1972).  Schrieber, 407 F.3d at 50.  New York courts have applied the Neumeier principles to questions of vicarious liability.  See Elson v. Defren, 726 N.Y.S.2d 407, 413 (1st Dept. 2001).[109]

Under Neumeier, when the parties have different domiciles and it is not clear that the law of a domicile favors its respective litigant, the law of the place of the tort applies, "unless displacing it will advance the relevant substantive law purposes without impairing the smooth working of the multi-state

---

[109] Under New York law, an attempt to use agency principles to hold a party liable for the tort of another is properly characterized as a question of vicarious liability.  See Filemyr v. Lombardo, 782 N.Y.S.2d 670, 671 (2d Dept. 1992).

system or producing great uncertainty for litigants." Schreiber, 407 F.3d at 50 (citation omitted).[110]  The relevant jurisdictions for the Neumeier analysis would be the Sudan, which is both the locus of the tort and the domicile of most of the plaintiffs,[111] and the law of Canada, the domicile of Talisman.  Under Neumeier, the presumption is that the law of the Sudan would apply.

The plaintiffs have not provided evidence of the law of agency from either the Sudan[112] or Canada.  There is no reason to find that application of domestic law would be appropriate.  Even if American law were applied it may not be appropriate under American law to impose liability on the parent of a closely-related subsidiary when the corporate veil cannot be pieced.  See Itel, 909 F.2d at 702 (declining to reach issue of whether liability could be imposed on related corporations through agency theory without piercing the corporate veil).  This Court declines to investigate these complex issues of foreign law in the absence of assistance from the parties.  See In re Magnetic Audiotape

---

[110]  Neumeier set forth three rules to guide a court in choosing between the relevant interests at stake.  Schreiber, 407 F.3d at 50.  "The first applies when the parties share a domicile; the second applies when the parties are domiciled in different states and the law of each state is favorable to its respective litigant; and the third is applicable to all other split-domicile cases."  Id.

[111] Three of the plaintiffs, NCDS, Garbang, and Hoth, reside in the United States and are domiciliaries of Minnesota, Illinois and Nebraska, respectively.

[112] While the Sudan is not an adequate forum for this litigation, see Presbyterian Church, 244 F. Supp. 2d at 335-36, that does not mean that Sudanese law should not supply the rule of decision.

Antitrust Litig., 334 F.3d 204, 209 (2d Cir. 2003).  Having

chosen to assert an agency theory of the eve of summary judgment

practice, and to argue that they can proceed to trial on an

agency theory, the plaintiffs had the obligation to support their

theory with an adequate choice of law analysis.  Having failed to

do so, for the reasons already described, their motion to amend

to plead this theory is denied.[113]


D.   English Subsidiaries

     Even if the plaintiffs had shown that it is appropriate to

pierce the corporate veil of TGNBV and Goal Olie, they would

still need to pierce the corporate veil of three more English

corporations in order to reach Talisman.  Talisman (UK),

Supertest and Igniteserve were each formed under laws of England.

English law recognizes each company in a group of companies as a

separate legal entity with separate rights and liabilities.  A

company will not be held liable for the misconduct of another

based solely of ownership.  When a plaintiff attempts to hold a

parent liable for the acts of a subsidiary separated by one or

more intermediate companies, the plaintiff must justify the

piercing of the corporate veil of each separate corporation.

     English courts will pierce the corporate veil to hold a

parent liable when the subsidiary is so totally under the control

---

[113] As explained in the first section of this Opinion, the
plaintiffs need at a minimum to be able to impose liability on
Talisman for GNPOC's actions.  Tagging Talisman for TGNBV's
conduct gets them only part way on that journey.

of the parent that it cannot be said to be carrying out its own business.  In order to succeed on this theory there must be evidence of something more than supervision or control by the parent of the subsidiary.  An English court will also pierce the corporate veil when a subsidiary is a mere sham or a façade.  As previously described, a corporation will only be found to be a façade when it was established as a device to evade existing obligations to other parties.

The plaintiffs have not presented any evidence to show that the English subsidiaries did not have distinct businesses or that they were created to avoid existing debts.  The only evidence that has been introduced about the corporate structures establishes that the Boards of Talisman UK and Supertest were identical and included Talisman employees Buckee and Sheppard. Taken in the light most favorable to the plaintiffs, this evidence is insufficient to create a material issue of fact that the corporate veil of any of the English subsidiaries should be disregarded.

In sum, the plaintiffs will not be permitted to amend their complaint to hold Talisman liable on theories of liability not pleaded in the 2003 Complaint.  They have not explained why they delayed in presenting this motion to amend, and many of the theories they advance are either clearly futile or inadequately supported.  To the extent that the plaintiffs seek to hold Talisman liable for aiding or conspiring with someone other than the Government, that application is also denied on the ground

110

that the plaintiffs have utterly failed to show good cause for this transformation in the theory of their case.

### Conclusion

Talisman's motion for summary judgment is granted.  The plaintiffs' motion to amend is denied.  Talisman's motion to preclude plaintiffs from seeking certain categories of damages is denied as moot.

Dated:     New York, New York
           September 12, 2006

                                    _____
                                         DENISE COTE
                              United States District Judge

111